| | | |
|---|---|---|
| THE PARISH OF PLAQUEMINES | * | CIVIL ACTION |
| | * | |
| versus | * | |
| | * | |
| RIVERWOOD PRODUCTION | * | NO. |
| COMPANY, INC., CHEVRON U.S.A. | * | |
| INC., EXXON MOBIL | * | JUDGE |
| CORPORATION, CONOCOPHILLIPS | * | |
| COMPANY, AND THE ESTATE OF | * | MAGISTRATE JUDGE |
| WILLIAM G. HELIS, AND GRAHAM | * | |
| ROYALTY, LTD. | * | |
| | * | |
| | * | |
| | * | |
| | * | |

---

## NOTICE OF REMOVAL

Defendants, Chevron U.S.A. Inc., Exxon Mobil Corporation, and ConocoPhillips Company ("the removing Defendants"), with a full reservation of rights, defenses, objections, and exceptions, hereby remove to this Court, pursuant to 28 U.S.C. §§ 1331, 1367, 1441 and 1442, the above-captioned civil action bearing the number 60-989 in the 25th Judicial District Court for the Parish of Plaquemines (Division "B"), State of Louisiana.

### INTRODUCTION

On April 30, 2018, Plaintiffs filed an expert report purporting to identify state "permitting violations," which revealed for the first time in this litigation that their claims primarily attack activities undertaken before the state permitting law at issue was effective and that were instead subject to extensive and exclusive federal direction, control, and regulation. As is now clear, contrary to Plaintiffs' lengthy and repeated disclaimers, their claims (1) implicate wartime and national emergency activities undertaken at the direction of federal officers, and (2) necessarily require resolution of substantial, disputed questions of federal law. For these two independent

1

reasons, the removing Defendants respectfully remove these cases pursuant to 28 U.S.C. §§ 1331, 1367, 1441 and 1442.

## BACKGROUND

This case is one of 42 lawsuits filed against 212 oil and gas companies by a group of private attorneys representing the Parishes of Plaquemines, Jefferson, Cameron, Vermillion, St. Bernard and St. John the Baptist ("the parish lawsuits"). Each of the 42 petitions contains nearly identical factual allegations—relating to dredging, drilling and waste disposal—and assert a single statutory cause of action for violation of Louisiana's State and Local Coastal Resources Management Act of 1978 ("SLCRMA"). SLCRMA's narrowly drawn enforcement provision, La. State. Ann. § 49:214.36(D), provides a cause of action only when a defendant has (1) violated a state-issued coastal use permit, or (2) failed to obtain a coastal use permit when one was required, and, in either event, only after the exhaustion of administrative processes that were not utilized by any of the Plaintiffs here.

Plaintiffs initially framed their allegations to avoid federal court. And initially they were successful. Shortly after being sued, Defendants removed the parish lawsuits to federal court. In seeking remand, Plaintiffs avowed to pursue a narrow regulatory action under state law and steadfastly denied that their permit-enforcement lawsuits had any federal dimension. Plaintiffs dismissed the notion that any aspect of their lawsuits implicated federal permitting or regulatory standards or that any alleged activities were federally directed. Plaintiffs assured the Court that their cause of action raised no important federal questions. In light of these assurances, the Court ordered the parish cases remanded, observing that they exclusively pled state law claims for "coastal use permitting violations" under SLCRMA.

We now know that Plaintiffs' assurances were unfounded. On April 30, 2018—after years of disclaiming reliance on any standards other than SLCRMA's coastal use permitting law—Plaintiffs served a "Preliminary Expert Report on Violations" that attacks scores of federally directed and authorized activities, and activities that were subject only to federal regulation. The report's principal author and leading "expert" is a practicing environmental lawyer from Houston.  Remarkably, most of the alleged activities were conducted decades before SLCRMA took effect in 1980.  Many of the activities now at issue were authorized *only* by federal permits or governed *only* by federal standards. They were conducted when Louisiana had not even conceived of its coastal management laws, which were only adopted pursuant to federal statute in the first place.  *See* 16 U.S.C. §§ 1451-1464, Ch. 33, Coastal Zone Management Act of 1972.

Indeed, now that they are back in state court, Plaintiffs have jettisoned their state-law permit enforcement action in favor of a full-throttle attack on nearly a century of federally authorized activities. Not only that, but the core activities at issue in the Report—the drilling and dredging that formed the basic infrastructure for these operations—began in World War II, when the federal government exercised pervasive control over nearly every aspect of oil and gas production. Over the next 40 years (still before SLCRMA took effect), the oil and gas activities that began in wartime matured into one of Louisiana's most economically important industries. Plaintiffs knew of these activities, encouraged these activities, and acquiesced to exclusive federal regulation of many of these activities. And when SLCRMA was enacted, the State of Louisiana exempted all prior lawfully commenced and continuing activities from SLCRMA's regulatory regime, and has consistently disavowed any authority to regulate activities completed prior to the enactment of SLCRMA. But now, decades later, Plaintiffs allege that Defendants—

despite obtaining authorization and encouragement from federal and state regulators (and in many cases explicit federal direction and control)—conducted their pre-1980 activities "in bad faith." Plaintiffs' newly minted allegations cannot be adjudicated without answering important federal questions.

Whereas Plaintiffs initially avoided federal jurisdiction by narrowly shrouding their claims under SLCRMA and strategically tip toeing through an area of pervasive federal interests, they have now abandoned the pretense of narrow pleading and have submitted a report formally verified by an official of the State of Louisiana who has proclaimed a massive retroactive application of SLCRMA under new regulatory standards that have never before been promulgated, documented, adopted, applied or enforced by the State of Louisiana or any parish. Plaintiffs purport to do so using the very instrument that led the federal government to sanction Louisiana's coastal program, and by seeking damages going back decades during which there was exclusive federal regulation of relevant activities. Plaintiffs' newly-filed expert report and attestation of newly-minted regulatory standards now make this case fundamentally about federally directed, federally permitted, and federally regulated activities. This case is now, without a doubt, federal in nature and belongs in federal court.

That is the lesson from *Board of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., LLC*, 29 F. Supp. 3d 808, 862–63 (E.D. La. 2014) ("*Levee Board* case"), where this Court found federal jurisdiction over state-law tort claims for the same activities at issue here. In affirming both this Court's finding of subject matter jurisdiction and its dismissal on the merits, the Fifth Circuit observed that the federally authorized dredging, exploration and production activities at issue in the *Levee Board* case raised important federal questions:

4

The absence of any state law grounding for the duty that the Board would need to establish for the Defendants to be liable means that that duty would have to be drawn from federal law. Supreme Court precedent is clear that a case arises under federal law where "the vindication of a right under state law necessarily turn[s] on some construction of federal law". . . . [T]he validity of the Board's claims would require that conduct subject to an extensive federal permitting scheme is in fact subject to implicit restraints that are created by state law. The implications for the federal regulatory scheme of the sort of holding that the Board seeks would be significant, and thus the issues are substantial.

*Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 723-24 (5th Cir. 2017), *cert. denied sub nom.*, 138 S. Ct. 420 (2017).

   **A.  To avoid federal court, the parishes did not identify specific "permitting violations" and broadly disclaimed any reliance on federal law.**

   After Defendants initially removed the parish cases, counsel for the parishes sought to avoid the *Levee Board* result by emphasizing, both in briefing and via affidavits, the exclusively state law nature of their permit enforcement claims. For instance, Defendants noted that while the petitions generally failed to identify the alleged "permitting violations," certain of the petitions listed coastal use permit application numbers in their exhibits, for which a search of state records reflected an "NDSI" determination had issued. An NDSI determination is a finding by the state that the proposed activity would have "no direct and significant impact" on coastal waters and therefore *did not require* a state coastal use permit. La. Stat. Ann. § 49:214.34(A)(10). For many of these "NDSI" permit files, a federal Army Corps of Engineers permit issued for the same activity. Defendants argued that to the extent the parishes were suing to enforce the federal Army Corps of Engineers' standards—the governing regulatory standards reflected for those NDSI activities—the case would raise an important federal question for the

same reasons adopted by the Fifth Circuit in the *Levee Board* case. *See, e.g., St. Bernard v. Atlantic Richfield Company*, 2:16-cv-16294 (Doc. 83, Defendants' Br. at 5).

Counsel for the parishes responded by largely disclaiming the list of permits appended to its Petitions as an "error in the Parish's Petition" that did not actually reflect the enforcement claims at issue—which remained unidentified. *Id.*, at Doc. 82 (Plaintiffs' Br., at 6 ("The List, on its face, includes some items that are clearly not relevant to this case and are clearly *not alleged to be sources of Defendants' liability*.") (emphasis added)). To secure remand, Plaintiffs also submitted affidavits disclaiming any reliance on standards promulgated by the Army Corps of Engineers; they even conceded that the activities that received NSDI determinations were "not subject to any [state Coastal Management Division] jurisdiction due to the lack of direct and significant impact on coastal waters." Ex. 28, at ¶ 8, Aff. of Joel L. Lindsey (5/10/17).

Relying on these and similar disclaimers, the court previously concluded that "[Corps of Engineers] standards are not relevant" to resolving the parishes' coastal use permit enforcement claims, and concluded that whether SLCRMA was violated "can be determined without referring to any federal standards." *St. Bernard Parish v. Atlantic Richfield Co., et al.*, 2:16-cv-16294 (7/6/17), Doc. 89, at 11. The cases were remanded.

Following the earliest remand orders, the State of Louisiana—through the Attorney General and the Louisiana Department of Natural Resources—intervened in the parish lawsuits to protect the State's interests. But the State Plaintiffs have continued to allow the parishes' private attorneys to take the laboring oar in advancing the claims alleged in the petitions, which until recently the State did not endorse and, it appears, had not fully investigated. Louisiana Department of Natural Resources ("DNR") attorney Blake Canfield testified that the DNR had "reviewed the coastal use permits specifically mentioned in the suit" but did not have "any

6

evidence of coastal use permits having been violated that are not being addressed."[1] And in January 2018, Assistant Attorney General Ryan Seidemann told the Plaquemines Parish state court that the State of Louisiana "based [its] assertions [via intervention] solely on what was asserted by the Parish" and "did no independent review of the Parish's position." Ex. 7, at p.39, Transcript of Jan. 5, 2018.

Back in state court, Defendants filed motions requesting that Plaintiffs identify the alleged state-law violations that formed the purported basis for these lawsuits. While every court to consider the question found the Original Petitions improperly "vague" under Louisiana law, the first time the Plaintiffs were required to identify the alleged permitting violations and explain their liability theory was April 30, 2018. *See* Ex. 8, at 2, Case Management Order ("Plaintiffs shall provide preliminary expert reports which contain detailed descriptions of the specific violations of SLCRMA believed to have been committed by Defendants, including instances where Plaintiffs claim a specific permit was violated and any instances where Plaintiffs claim Defendants failed to obtain a permit, on or before April 30, 2018.").

On April 30, Plaintiffs served their Preliminary Expert Report on Violations (the "Report"), which Keith Lovell, the Assistant Secretary of the Office of Coastal Management for the Louisiana Department of Natural Resources, signed under the writing: "[I]t is my opinion that the conclusions reached are consistent with the Louisiana State and Local Coastal Resources Management Act and practices of the Office of Coastal Management, Department of Natural Resources, of the State of Louisiana, in administering and enforcing the Act." Ex. 1, Preliminary Expert Report on Violations, in *The Parish of Plaquemines v. Rozel Operating Company*, et al, April 30, 2018. For the first time in this litigation, the Report alleges previously unidentified

---

[1] http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2014/May_2014/0521_14_NR (Canfield's testimony begins at 36:35)

"permitting violations" relating to hundreds or even thousands of federally authorized and permitted activities, many of which the state previously found would have "no direct and significant impact on coastal waters."

**B. After remand, Plaintiffs identify "permitting violations," to include virtually all federally authorized mineral activity since the early 1900s.**

Plaintiffs' Report is remarkable. Plaintiffs not only backtrack on statements made to secure remand, they claim that SLCRMA—a state law that took effect in 1980—applies retroactively to render unlawful virtually *all* oil and gas activity dating back to *discovery of the first oilfield* in the parish, which Plaintiffs identified in the Report as occurring *in 1941*.

The Report, authored by a practicing environmental lawyer retained as Plaintiffs' "expert" opens by quoting and relying upon language from a 1980 federal Final Environmental Impact Statement ("FEIS"), submitted for proposed federal approval of Louisiana's Coastal Resources Program:

> Any use or activity which, prior to the initiation of the coastal use permit program, has been lawfully commenced in good faith and for which all required permits have been obtained is consistent with the Coastal Management Program and no coastal use permit is required for it…. Moreover, such use or activity shall thereafter be consistent with the program even if renewals of previously issued permits become necessary or if new permits are required by other governmental bodies provided that there is no significant change in the nature, shape, size, location or impacts of the use or activity.

Ex. 1, Report at 28 (quoting FEIS, at 84-85). This language relates to an exemption from SLCRMA's coastal use permitting requirements for activities "lawfully commenced" prior to SLCRMA's enactment. *See* La. Stat. Ann. § 49.214.34(c)(2) ("Individual specific uses legally commenced or established prior to the effective date of the coastal use permit program shall not require a coastal use permit."). However, the authors of the FEIS added their own gloss to that exemption, attempting to offer guidance on the types of activities that would be exempt:

8

To be so exempted, a use or activity must have met the following requirements prior to the date of the coastal use permit program:

1) Actual construction or operation of the use or activity must have been begun in good faith; and
2) All permits, licenses, and clearances required by governmental bodies must have been obtained and the use or activity must be in compliance with them; and
3) No significant change in the nature, size, location or impacts of the use or activity take place.

Ex. 1, Report at 28 (quoting FEIS at 85).

Seizing upon a distortion of that language, the Report turns the rest of the FEIS language—and the exemption in SLCRMA itself—on its head to allege violations relating to pre-1980 activities that were subject to federal permits and regulation. Plaintiffs' allegations include the following activities:

- *Pre-SLCRMA activities conducted in bad faith.* Oil and gas activities commenced before 1980 were "in bad faith" because, in Plaintiffs' opinion, they were not done "in accordance with best practices," and are therefore unlawful irrespective of the exemption for pre-SLCRMA activity (Ex. 1, at 68);

- *Pre-SLCRMA activities conducted in good faith.* Any remaining oil and gas activities lawfully commenced before 1980 in good faith *also* do not meet the exemption for pre-SLCRMA activity because, according to Plaintiffs, the FEIS reference to "significant change in the . . . impacts" renders virtually every pre-SLCRMA activity unlawful—and indeed rendered it unlawful immediately upon SLCRMA's enactment—irrespective of the exemption for pre-SLCRMA activity, since "the Coastal Zone of Louisiana exemplifies change." (Ex. 1, at 28);

- *Post-1980 activities.* Activities commenced after 1980, for which the state previously issued coastal use permits or NDSI determinations expressly

9

authorizing the use, are *also* unlawful, because the permit applications allegedly did not disclose the "cumulative impacts" (defined as "impacts increasing in significance due to the collective effects of a number of activities") of the proposed conduct combined with numerous other independent and unrelated entities' activities in the coastal zone. (Ex. 1, at 116).

And on the basis of these sweeping allegations, the Report contends that activity conducted pursuant to federal or state permits or NDSI determinations "*must be removed* and the coast restored." *Id.* at 116.

In offering this novel interpretation of the exemption for pre-SLCRMA activities and SLCRMA's coverage, the Report reveals why a DNR attorney was unable to find "*any* evidence of coastal use permits having been violated that are not being addressed." *Supra*, n. 1. Since SLCRMA took effect in 1980, DNR consistently assured operators that the exemption for lawfully commenced activities meant *the opposite* of what Plaintiffs now claim it means. For instance, in 1983 the DNR told an operator that "since your project [dredging a canal] was completed prior to Sept 20, 1980, which was the beginning date of the Coastal Use Permitting Program, the project is considered exempt from the jurisdiction of the La. Coastal Resources Program." Ex. 9 (May 17, 1983 Letter from DNR re "Dredging Navigation Canal W of Boston Bayou.").

But for litigation purposes, Plaintiffs for the first time have taken a new and different view of SLCRMA's reach for the simple reason that the vast majority of oil and gas operations about which Plaintiffs complain predate SLCRMA. In fact, Plaintiffs state in their Report that "[b]y 1979 the oil and gas canal network was almost entirely developed." Ex. 1, at 5. This is an acknowledgement by Plaintiffs that, for all intents and purposes, their SLCRMA lawsuits focus

10

on pre-SLCRMA activities. These are the very activities that were directed and authorized by the federal government. Moreover, Plaintiffs' claims that such activities were conducted in "bad faith" and therefore were not "lawfully commenced" and exempt from SLCRMA directly implicate the federal laws and regulations that actually governed Defendants' pre-SLCRMA activities at the time they were conducted. It is impossible to adjudicate Plaintiffs' claims without grappling with the exemption's application to pre-1980 federally controlled activities or considering the numerous federal laws, regulations and orders that predated SLCRMA. That is true in every one of the 42 cases the parishes have filed using the same allegations in the petition here.

The Report's wholesale and sweeping assertions of illegality also reveal Plaintiffs' core theory that every form of federally authorized or directed mineral development activity since the earliest development in the coastal zone has been unlawful. Plaintiffs even argue that certain Defendants' wartime activities—activities performed at the explicit direction of the federal government, in the service of the war effort—were conducted "in bad faith." Plaintiffs' practicing environmental attorney "expert" offers a sweeping view of Defendants' "permitting violations," to include:

- *World War II-era exploration and production activities.* The activities at issue in the Report, and in each of the parishes whose petitions have been simultaneously removed to this court, began by the early 1940s under the shadow of war. In that period, mineral production activities in Louisiana and elsewhere were dictated, controlled and intensely managed by the United States Petroleum Administration for War ("PAW"). Plaintiffs now claim that these federally directed and controlled activities were done "in bad faith" because they were "not in accordance with best practices" Ex. 1, Report at 68, 82-3; *see also id.* at 13 (describing "the first well for early production in the 8,900 ft. sand in late 1941" and alleging, among other things: "the 24/7 nature of operations of the equipment generated accelerated wave action that erodes levees and destroys marshes"); *Compare* Ex. 21, at 16-17, Records of PAW ("[I]t will be necessary to accelerate drilling activity from now on to the end of the year if the 1945 program of 27,000 wells is to be realised."); Ex. 46, at 2, Oil & Gas Journal, May 5, 1945 ("current

PAW quotas are pushing against the ceiling of the district's capacity to produce efficiently. But given sufficient steel and manpower to sustain the drilling program, preferably at an even higher rate than at present, these quotas can be maintained for another 6 months without harm.... Since production has conformed very closely with the PAW monthly crude quotas, it is possible to chart the history of the war demand for crude and its relationship to District 3 [including Louisiana's] capacity to produce at maximum efficient rates."); Ex. 47, at 215 1943 Department of Conservation Biennial Report ("By August, 1943, our war activities had reached high development and that month marked the beginning of a period during which all the states were asked to produce practically all the oil that could be taken without injury to the wells and reservoirs, except where the transportation problems forced temporary 'normality.' This condition will probably persist until the end of the war.").

- *Wartime use of earthen pits instead of steel tanks*. During World War II, steel was scarce and sorely needed for the war effort. To preserve wartime resources, the federal government strictly rationed Defendants' steel usage, prohibiting the acquisition and use of materials except for operations specifically described and authorized in the applicable "use order" prepared by the Office of Petroleum Coordinator. Ex. 21, at 9-12, Records of PAW. Yet Plaintiffs argue that Defendants' use of earthen pits instead of "*steel tanks* in the late 1930s and early 1940s" (Ex. 1, at 82) was "in bad faith and therefore could not have been lawfully commenced when [Louisiana's] Coastal Program commenced in 1980" (Ex. 1, at 68); *Compare* Ex. 4, at 8, Records of PAW (referencing "M-126—Issued May 5, 1942" which "restricted use of … steel for the manufacture of various commodities"), and *id.* at 9 (referencing "Controlled Materials Regulation No. 1, Issued Jan. 12, 1943": "Established procedures under the Controlled Materials Plan for allocation of aluminum, steel and copper"); Ex. 22, at 6-7, Records of PAW ("the materials in the form of controlled materials or items manufactured from controlled materials cannot be made available for petroleum industry operators"); Ex. 16, *Fightin' Oil* at 138 ("In view of the critical shortage of steel, it is necessary to limit drilling in proven areas to the minimum needed for effective recovery, while at the same time we are encouraging drilling in promising areas.").

- *Dredging of federally regulated canals*. Since the 1940s, Defendants have dredged canals in southern Louisiana, subject to federal statutory control and subject to applicable requirements for federal permits in certain instances. These canals, which served important national interests, were allowed and authorized by federal regulators without any protest from the State.  But now Plaintiffs' Report claims the mere existence of canals evidences "bad faith" because "best practices" were to instead build "networks of roads" through the marsh. Ex. 1, at 82-3. Plaintiffs make this astonishing claim despite the explicit federal authorizations and decades of encouragement by state and local authorities. Many federal dredging permits even provide that "Specific State authority for the proposed

12

work is *not required*." Ex. 10, at 8 (emphasis added); *see also* Ex. 11 at 6 ("specific state authority for the proposed work is not required");

- *Early field layout and development.* From its 2018 vantage point, the Report alleges that, as far back as the 1940s, Defendants should have used a different variety of early field exploration, production and development techniques (*e.g.*, decreased well spacing, directional drilling, construction activities, produced water discharge procedures, and various alternatives for shortening "flowline distance"), and alleges that the failure to do so was in "bad faith." (Ex. 1, at 82-3) These allegations directly contravene detailed federal war-powers directives governing the same development processes. *See, e.g.*, Ex. 6, National Defense, Petroleum Administration for War, Supp. Order No. 13, July 1, 1944, at 1 ("the distance between any two points farthest apart on the drilling unit upon which the well is located must not exceed a distance of 1100 feet"); *id.* at 2 ("the well must be drilled …to maintain a vertical well bore");

- *Oil extraction activities.* The Report implies that methods used in the process of efficiently and expeditiously extracting oil from the ground during war time or oil embargo periods constituted "bad faith." *See, e.g.*, Ex. 1, Report at 57 ("In particular, produced water from 1941 to 1993 was discharged overboard instead of putting the produced water back into the reservoirs to minimize voidage and subsidence."); *id.* at 60 ("Texaco and Apache extracted approximately 23 million bbls of oil & condensate, 180 BCF of gas and 110 million bbls of produced water from the Delacroix Island Field from 1941-2005"). In reality, such methods were accepted practice for production at the time, and the federal government frequently ordered operators to comply with certain metrics for production that are incompatible with the duties the Plaintiffs seek to impose (retroactively) here. *See* Ex. 5, Records of PAW ("[Louisiana's] District must continue to produce maximum quantities…"); Ex. 37, at 1, Records of PAW ("drilling of injection wells in connection with pressure maintenance operations…is contrary to the express language of Supplementary Order No. 6").

The Report cites no state law standards for assessing "bad faith" in this context, and there are none. Not before 1980 and not today. For pre-1980 federally regulated or authorized and directed activities—activities commenced and often completed before SLCRMA was even proposed—any question of bad faith would raise a significant *federal* question. The Fifth Circuit's *Levee Board* opinion found no Louisiana state law standard of care applicable to far more recent dredging activity. *Board of Commissioners*, 850 F.3d at 723 ("The absence of any state law grounding for the duty that the Board would need to establish for the Defendants to be

liable means that that duty would have to be drawn from federal law."). As for alternative methods, federal law dictated whether access should be provided by road or canal.

Not only do Plaintiffs seek to impose sweeping liability under amorphous standards—they seek to do so against Defendants *en masse*, as an undifferentiated group. For all purported "permitting violations" dating back to the earliest development in the earliest field, Plaintiffs allege that damage to Louisiana's coastal zone constitutes an "indivisible injury" for which all of the Defendants are solidarily liable under Louisiana law. The lawyer-drafted expert Report further relies on the notion that the "cumulative impacts" of this allegedly unlawful conduct render unlawful any post-1980 conduct for which the state issued a "coastal use permit" or NDSI determination.

The Plaintiffs' Report thus profoundly transformed the nature and scope of this lawsuit. This is no longer a state permit enforcement action.  SLCRMA is merely a means for Plaintiffs to try to stay in state court.  Instead, Plaintiffs are pursuing a referendum on the history of oil and gas development in Louisiana via a massive "bad faith" lawsuit that alleges violations arising from decades of federally authorized, directed and controlled activities. Whether Defendants activities were in "bad faith" turns not on SLCRMA—which took effect long after the fields at issue were developed—but instead on the background federal permits, orders and regulations. And in terms of relief, Plaintiffs demand that Defendants restore the entire parish coastal zone to the "original condition" (Ex. 2, Prayer).  Plaintiffs' lawyer-drafted expert Report claims that to obtain this relief, they need only show that state-approved coastal uses "in the opinion of the [Louisiana] Department of Natural Resources," are no longer within the scope of the uses as approved, a conclusion the DNR has allegedly reached. Report at 116 ("The guidelines define cumulative impacts as those 'increasing in significance due to the collective effects of a number

14

of activities'…. The cumulative impacts … violated the terms of [coastal use permit] condition #3 because they were beyond the scope of impacts of the use, as permitted.").

Plaintiffs ignore that Federal Coastal Zone Management Act regulations address and provide an administrative process before the National Oceanic and Atmospheric Administration ("NOAA") for what the State is seeking to do here: to challenge federally authorized or permitted activities that it originally consented to on the grounds that they are now "having coastal effects substantially different than originally described." 15 C.F.R. § 930.65(b) (requiring that "The State agency *shall notify* the relevant Federal agency representative" and setting forth administrative process to follow). For the jurisdictional reasons more fully described below, Defendants remove the cases to this Court so that these and other federal issues may appropriately be raised.

## REMOVAL GROUNDS

Plaintiffs' new theory that SLCRMA applies retroactively to exploration and production activities during World War II—the genesis of increased coastal zone development in the parishes at issue—and the boundless alleged "permitting violations" before 1980 contained in Plaintiffs' recently served expert "Report On Violations," reveal federal question and federal officer jurisdictional grounds that were not "affirmatively revealed on the face" of Plaintiffs' initial pleadings. *Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 400 (5th Cir. 2013). Because DNR has adopted the Report as "consistent with the Louisiana State and Local Coastal Resources Management Act and practices of the Office of Coastal Management, Department of Natural Resources, of the State of Louisiana," these newly served allegations clarify that these federal issues are directly implicated and that grounds for federal jurisdiction exist in the 42 substantially similar cases Plaintiffs have filed. DNR's certification essentially adopts the

15

theories and arguments offered in the Report as representing an accurate interpretation of SLCRMA and an accurate description of the Office of Coastal Management, Department of Natural Resources' practices in administering and enforcing the Act, including in bringing these suits. Accordingly, and for the reasons explained below, the removing Defendants remove these cases on grounds of federal officer jurisdiction under 28 U.S.C. § 1442 and federal question jurisdiction under 28 U.S.C. §§ 1331, 1367, and 1441.

## I.  Removal is Timely

Defendants filed this Notice of Removal within 30 days of receipt of the Report, as required by 28 U.S.C. § 1446(b)(3) ("a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an … other paper from which it may first be ascertained that the case is one which is or has become removable"). Expert reports may serve as an "other paper" providing a basis to remove an action.  *Fink v. Regis Corp.*, 2012 WL 601449, at *5 (W.D. La. Feb. 22, 2012) (expert report was "other paper" making case removable); *Nicole v. Sch. Dist. of Philadelphia*, 2016 WL 3456924, at *3 (E.D. Pa. June 20, 2016) ("we find that the expert reports as well as the correspondence between the parties' attorneys are 'other paper' that could indicate a case has become removable under 1446(b)"); *Gibson v. Clean Harbors Envtl. Services, Inc.*, 840 F.3d 515, 522 (8th Cir. 2016) (expert report was "other paper" for removal under CAFA).

The Report was served by Plaintiffs in this case.  But even an "other paper" served in a different case can serve as a basis to remove a related or even an unrelated case.  *See, e.g., Grenzebach Corp. v. WPS Indus., Inc.*, 2008 WL 11351455, at *4 (M.D. La. June 19, 2008) (an "other paper" resulting from "a related case involving a common defendant and similar facts can trigger removability of a pending case under 28 U.S.C. § 1446(b)"); *Burnet v. Butler*, 2012 WL

16

2338740 (E.D. La. June 19, 2012) (a motion filed in a related succession lawsuit was the "other paper" that triggered removability); *Halmekangas v. State Farm Fire & Cas. Co.*, 2007 WL 1125760, at *2 (E.D. La. Apr. 16, 2007) ("ANPAC then filed its Notice of Removal within thirty days of its receipt of the Complaint in 06-3942. This Court finds that ANPAC's receipt of the Complaint in case no. 06-3942 does constitute an 'other paper' sufficient to trigger the running of the 30-day period within which to remove. Although 06-3942 and 07-1006 are separate cases against different Defendants, this Court does not consider them unrelated as both cases deal with property damage to the same property. However, even if they are unrelated, orders or pleadings filed in unrelated cases can constitute an 'order or other paper' under 28 U.S.C. § 1446(b)").

To assess whether removal is timely, the Fifth Circuit applies a "bright line rule" requiring "the plaintiff, if he wishes the thirty-day time period to run from the defendant's receipt of the initial pleading, to place in the initial pleading a specific allegation" that unambiguously reveals the nature of the claims asserted. *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 (5th Cir. 1992). The Fifth Circuit adopted this rule because "it promotes certainty and judicial efficiency by not requiring courts to inquire into what a particular defendant may or may not subjectively know." *Id.*

Plaintiffs took a different approach in their initial pleadings here, devoting 23 sub-paragraphs to identifying what they "do not plead," in a transparent effort to avoid federal court. The petitions do not reference "bad faith," do not allege violations going back to the 1940s, and do not reveal that Plaintiffs would challenge as unlawful virtually all federally directed, controlled or authorized activities in the coastal zone. Nor do the petitions indicate Plaintiffs' intent to rely on a theory of liability that requires proving that federally approved impacts to the

coastal zone were "significantly changed" in the years after SLCRMA took effect, as the Report now alleges.

The petitions' only reference to pre-SLCRMA activity claims that Defendants' activities were "prohibited prior to 1978 by various provisions of Louisiana Statewide Orders 29, 29-A, and 29-B, various field wide orders, as well as various orders of the Louisiana Stream Control Commission." Ex. 2, Pet. ¶ 29. The cited regulations—Orders 29, 29-A and 29-B—do not purport to govern dredging, much less all of the pre-1980 dredging activities that the Report now claims were "in bad faith" or "not lawfully commenced." Likewise, whatever was intended by the Petition's recitation of "various field wide orders or various orders of the Louisiana Stream Control Commission," the Report again cites no state law that would apply to pre-SLCRMA dredging. And the Report does not cite any state orders or other sources of Louisiana law that would govern all or nearly all of the myriad of allegedly unlawful conduct dating back to the 1940s. *Cf.* Ex. 2, Pet. at 33(t) ("Plaintiffs make no claims under Louisiana tort law, contract law, mineral law, or property law").

Instead, the petitions focused principally on *post*-SLCRMA conduct that was purportedly governed by state law. *See, e.g.*, Ex. 2, Petition at ¶ 23 ("the discharge of such materials into the Operational Area *after 1978* was a flagrant violation of the CZM Laws"); *id.* ¶ 24 ("Defendants have utilized the Operational Area for the storage of their pollution or contamination, which likewise is a use for which a state and/or local coastal use permit has been required *since 1978*"). With respect to dredging in particular, the allegations in the petitions were directed to "exceed[ing] the limits of the coastal use permits issued in connection with the dredging of such canals," also *post-1980* conduct, and "fail[ing] to obtain the coastal use permits required for the *dredging* of such canals," another allegation suggesting canals originally dredged *after*

SLCRMA are at issue.  Ex. 2, Pet. ¶ 25.  The Petition did not suggest (much less specifically allege) that Plaintiffs would assert that all dredging since time immemorial was conducted in bad faith.

That the Defendants could not have ascertained from the face of the initial pleadings the Report's new theories for retroactive application is compounded by the SLCRMA-guidance that the Louisiana Department of Natural Resources had been delivering to operators prior to this lawsuit:

- In 1986, the DNR asserted that when "construction occurred in the early 1970s prior to the commencement of the Louisiana Coastal Resource Program (October, 1980), the Coastal Management Division does not have jurisdiction over this concern."  Ex. 12 at 9 ("Violation Investigation Correspondence dated May 29, 1986);

- In 1985, the DNR addressed an operator's "question related to the consequences resulting from violations of an activity where the activity commenced prior to September 20, 1980…"  The DNR advised that "the term 'lawfully commenced' has little or no meaning to our Act if applied before September 20, 1980 as there was no act existing that could be violated."  According to the DNR, "if no permit was required, there can be no violation of a permit; hence the words 'permitted activity' and 'unpermitted activity' are meaningless prior to September 20, 1980."  Ex. 13, at 3 (SONRIS Letter from DNR to Mr. Chris Piehler dated May 9, 1985 re "P830081" in "Cameron Parish, La.," enclosing "Memorandum dated May 11, 1983");

- In 1985, the DNR advised that "[a]ctivities which began prior to October 1, 1980 can be considered 'grandfathered' according to the Rules and Regulations for Coastal Use Permits." Ex. 18 (Letter from DNR dated October 7, 1985);

- In 1983, the DNR advised that, "since your [dredging] project was completed prior to September 20, 1980, which was the beginning date of the Coastal Use Permitting Program, the project is considered exempt from the jurisdiction of the La. Coastal Resources Program." Ex. 9, at 1 (Letter from DNR dated May 17, 1983);

- In 2006, the DNR advised: "Please be aware that only wells spudded after 1980 need to be included in the application. All others are out of CMD [Coastal Management Division] jurisdiction." Ex. 42, at 2 (Letter from DNR dated 12/21/06);

- In 2002, the DNR advised that, "CMD [Coastal Management Division] would have no have authority to require pit closure for a pit which was in place before the inception of our program (October 1987)." Ex. 43, at 2 (Letter from DNR dated 11/22/02);

- In 1988, the DNR advised "requiring the removal of all such [flowlines] is beyond the regulatory authority of CMD [Coastal Management Division], since many of the problem lines were installed prior to the implementation of the LCRP [Louisiana Coastal Resources Program]." Ex. 44, at 1 (DNR Memorandum dated June 10, 1988).

The ambiguities in the parishes' petitions are further compounded by the fact that the first notice any of the removing Defendants received of the purported "permitting violations" alleged in the petitions was the filing of these lawsuits. The DNR's own administrative procedures—which provide for notice and an opportunity to cure a permit violation before a civil action is filed—were abandoned wholesale by the Plaintiffs here. That abandonment led a state-court judge to dismiss one of the parish lawsuits for failure to exhaust administrative remedies. Ex. 14, Order of dismissal ("the existing administrative remedies must be pursued before a lawsuit for civil damages is pursued"). The state court reconsidered its ruling when DNR responded with an affidavit (Ex. 20, ¶ 4) claiming it could not meet the burden of complying with its own administrative procedures, because the violations covered a time period DNR estimated as "over thirty years" (which would then date back to around 1986). The recent Report reveals he was off by more than half: the practicing environmental attorney Plaintiffs hired as their leading "expert" has reinterpreted SLCRMA's effect to render more than 80 years of oil and gas activity unlawful.

II.    **Plaintiffs' allegations in the Report give rise to federal officer jurisdiction.**

Plaintiffs' new allegations cover a period that includes World War II, the Korean War, and the oil embargo periods, among other national emergencies. Plaintiffs challenge various wartime activities as "not lawfully commenced." But in fact, the federal government directed the activities described in the Report using detailed orders, laws and regulations. Plaintiffs' challenge to federally directed and controlled activities gives rise to jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442. *See also Savoie v. Huntington Ingalls, Inc.*, 817 F.3d

20

457, 463 (5th Cir. 2016) ("[R]emoval of the entire case is appropriate so long as a single claim satisfies the federal officer removal statute.") (citing 14C Wright & Miller, Fed. Prac. & Proc. Juris. § 3726 (4th ed.) ("Section 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.")).

"[T]he federal officer removal statute is to be 'broadly construed' in favor of a federal forum." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 811 (3d Cir. 2016). To demonstrate the requirements for removal, Defendants need only show: (a) that they were acting at the direction of an officer of the United States; (b) that they are "persons" as envisioned by the statute; (c) that the alleged conduct was undertaken "for or relating to" a federal officer or agency; and (d) that they have a colorable federal defense to the Plaintiffs' claims. *See Mesa v. California,* 489 U.S. 121, 124–25 (1989); *Papp*, 842 F.3d at 813. These elements are met because the Report specifically targets federally directed activities.

### A.     The federal government directed Defendants' activities.

The first prong of federal officer jurisdiction—the "'acting under' requirement—is 'liberally construed' to cover actions that involve 'an effort to assist, or to help carry out,' the federal supervisor's duties or tasks." *Papp*, 842 F.3d at 812 (citing *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007))). Courts have "explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813 (citing *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d at 470 (3d. Cir. 2015). Instead, "it is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between the [defendant] and the [federal officer or agency]." *Id*. at 812.

21

Activities that were conducted at the direction and under the control of the federal government are implicated in a case, like this one, seeking to restore the entire Parish's coastal zone. Notably, the field at the center of the activities described in the Report—the area containing the canals and wells and pits that Plaintiffs allege—was first developed during World War II, when the federal government directed the oil and gas industry to meet the needs of the nation's war efforts. Certain Defendants produced petroleum for military use and conserved steel so that ships, airplanes and bombs could be built. As the contemporaneous archived records of one of the Defendants in the parish cases report: "The impact of the war in Europe, which precipitated national defense activities and subsequently all-out efforts to win the war, completely revolutionized the operations of the petroleum industry as a whole, and our Company particularly." Ex. 15, Chronological Record of War Activities of the Texas Company, at 3.

The oil and gas industry could not act of its own accord during World War II. According to the Oil & Gas Journal in 1942: "Wartime exigencies forced strict control of every phase of the industry, and like others the petroleum industry virtually turned over its facilities to the command of the Government." Ex. 33, at 2. During the period of U.S. involvement in World War II more than 80 percent of the 7 billion barrels of crude oil needed to support the war effort was produced in the United States. This required domestic oil producers to increase supplies by 1 million barrels a day. Ex. 19, at 1, 169 (*A History of the Petroleum Administration for War*, 1941-1945). To meet this unprecedented need, President Roosevelt, by Executive Order 9276, created the Petroleum Administration for War ("PAW") to, among other things, "issue and take appropriate action to enforce such orders or directives to the petroleum industry, as the Administrator may deem necessary in order to: (1) Provide adequate supplies of petroleum for military or other essential uses; or (2) Effect the proper distribution of such amounts of materials

22

as the Chairman of the War Production Board may allot for the use of the petroleum industry." Ex. 19, at 376.

Secretary of Interior, Harold Ickes, led this effort and wrote at the outset: "I shall want to ask the oil industry to take action in order that costs may be kept down, oil and gas properly conserved, and the producing, transportation, refining and distributive facilities of the industry utilized *at maximum efficiency*." Ex. 19, at 383, Letter to Attorney General Robert Jackson, dated June 16, 1941 (emphasis added). Ickes underscored the federal need for oil and gas production: "We are moved by the stern need to keep our daily productive capacity at the highest possible level…." Ex. 16, at 134 (*Fightin' Oil*).  Ickes wrote that "the Petroleum Administration exists for the primary purpose of furnishing simple *direction* to the oil industry during the war period. It is now clear, I believe, to everyone that without such a central agency of Government, guiding and coordinating the efforts of the oil industry, the great task which will continue to face us in oil could not possibly be performed." Ex. 16, *Fightin' Oil* at 81.

Conserving materials required for oil and gas operations was critical to the war effort. Ickes stated that "Every proposal or application for materials is subject to the most searching study. We require answer to these questions—is the project essential to the war program; could any less critical material be substitute?" Ex. 16, *Fightin' Oil* at 89-90. Accordingly, PAW's Form 3 provided that before development of "all or any part of any oil, gas, or condensate field, it is necessary for the Petroleum Administration for War to determine the relationship of the specific case to the war needs." Ex. 48, at 1. This was not business as usual.

Notwithstanding the restriction on materials, documents from the time reflect that operators in Louisiana were called upon to increase production perhaps more than in any other region: "[T]he directives issued by the Petroleum Administration for War have made it necessary

23

that approximately fifty percent of all petroleum produced in this Nation, and practically the entire war-time increase over peace-time production, be supplied by District III," in which Louisiana sat. Ex. 26, District III Production Committee letter dated March 29, 1945, at 4; *see also* Ex. 40 (Certification Under Executive Order No. 9276, setting monthly production rates for Louisiana). When engineers and operators of District III complained that "a number of fields in the district are currently producing in excess of maximum efficient rates," the federal government responded that they should continue producing as ordered.  Ex. 27, January 3, 1945 Letter from Chairman of General Committee for District III to Deputy Petroleum Administrator.

To assure oil industry executives, whose assistance was demanded, the Attorney General declared: "In the present emergency acts performed by industry *under the direction of public authority, and designed to promote public interest* and not to achieve private ends, do not constitute violations of the antitrust laws." Ex. 19, at 383 (emphasis added). Such assurances proved necessary because of the special wartime role that industry was asked to serve: Representatives of the petroleum industry were appointed to serve directly on the Petroleum Industry War Council ("PIWC"). Ex. 23, Records of PAW, at 13; Ex. 24, Records of PAW, at 1. "The Petroleum Industry War Council … became virtually an operating agency for the petroleum coordinator, undertaking many assignments to initiate new programs."  Ex. 33, at 2. Ickes told the industry-led PIWC that "for the time being . . . we would surrender more than our initiative; we would surrender the right to do any independent thing or give expression to independent thoughts if they run counter to necessary military policy." Ex. 49, at 27. The PAW enlisted the PIWC to develop and implement directives to Louisiana operators to maximize efficient production of critically needed oil and gas—or, as Harold Ickes wrote, "do more with

24

less." Ex. 25, at 88 ("by doing more with less, the petroleum industry has been able to perform its functions in the war program in the face of unusual difficulties").

The national emergency during the dawn of production in Louisiana's coastal zone, resulted in the issuance of more than 5000 federal directives closely governing exploration, production, transportation, conservation, manpower usage, construction, drilling, spacing, disposal, and general operations. By virtue of their appointment to PIWC, industry implemented these directives in Louisiana, PAW's "District III." Plaintiffs' alternative "best practices," the absence of which the Report claims can affirmatively demonstrate that Defendants have acted "in bad faith," would directly contravene many of these federal orders, objectives and directives. Because the activities Plaintiffs seek to "remove" and "restore" and/or which form a basis for the alleged "solidary liability" were performed during a period of federal direction and control, Plaintiffs' allegations challenging their activities and the "cumulative impacts" of those activities, trigger the Court's subject matter jurisdiction under 28 U.S.C. § 1442.

**B.      Defendants are "persons" under § 1442.**

Corporate entities, such as Defendants, are "persons" envisioned by the federal officer removal statute. *See, e.g., Winters v. Diamond Shamrock Chemical Co.,* 149 F.3d 387, 398 (5th Cir. 1998) ("We have previously held that corporate entities qualify as 'persons' under § 1442(a)(1)"); *Leite v. Crane Co.,* 749 F.3d 1117, 1122 n.4 (9th Cir. 2014) (citing *Isaacson v. Dow Chem. Co.,* 517 F.3d 129, 135–36 (2d Cir. 2008)).

**C.      Plaintiffs' allegations were undertaken "for or relating to" a federal officer or agency.**

Section 1442's coverage of activities "relating to" a federal officer or agency, "was intended to 'broaden the universe of acts that enable Federal officers to remove [suits] to Federal Courts." *Papp*, 842 F.3d at 813. Courts have found "it is sufficient for there to be a connection or

association between the act in question and the federal office." *Id.* (citing *Defender Ass'n*, 790

F.3d at 471). Comparing just a sample of the Report's myriad allegations to the directives that

issued during just the first national emergency included in the Report's lengthy time period,

reveals a close causal nexus:

| Plaintiffs' Allegations | Federal Directives |
|---|---|
| "Prior to 1980," Defendants failed to "use networks of roads," instead of dredging to access well sites. Ex. 1, Report at 82. | Ex. 30, Preference Rating Order P-98b provides that "No operator may apply a rating assigned by this Order to obtain material the use of which may be eliminated by substitution of less source material or by change of design without serious loss of efficiency." (i.e., roads probably would not be approved when dredging is viable.); Ex. 32 (demonstrating that all activity has to be justified as supporting the public interest and war effort). |
| Defendants failed to use "saltwater injection wells" instead of pits "to prevent pollution and protect the environment. SWD wells were being installed by the industry going back into the 1920s." Ex. 1, Report at 82 | Ex. 30, Preference Rating Order P-98b provides that material preference ratings will apply only "to obtain delivery of material *to be used in any operation directly incident to the discovery, development or depletion of petroleum pools."* (i.e., not for injection well installation.); Ex. 36, Amendment to Conservation Order M-68 ("no operator shall order, purchase, accept delivery of, withdraw from inventory or in any other manner, directly or indirectly, secure or use Material for construction, reconstruction, expansion, remodeling, replacement, or improvement of facilities used in Production…. No Person shall deliver or otherwise supply, or cause to be delivered or otherwise supplied, any material which he knows, or has reason to believe is intended for such use.") |
| Defendants failed to use "steel tanks in the late 1930s and early 1940s. Tanks were safer and eliminated the need for leaking earthen pits, like those used by Texaco and ARCO in the Bayou Gentilly case area. This would reduce environmental damage." Ex. 1, Report at 82. | Ex. 29 (Office of Petroleum Coordinator for National Defense, a predecessor to PAW instructs "the oil industry to perfect plans that will result in the conservation for defense purposes of much of the steel and other metals used in the manufacture of containers in which petroleum products are transported, stored, distributed and marketed."); Ex. 36, Sen. Ellender letter to constituent ("STEEL IS AVAILABLE ONLY FOR WELLS IN AREAS WHERE GAS IS SERIOUSLY NEEDED"); Ex. 16, *Fightin' Oil* at 138 ("In view of the critical shortage of steel, it is necessary to limit drilling in proven areas to the minimum needed for effective recovery, while at the same time we are encouraging drilling in promising areas."). |
| Defendants failed to use | Ex. 31, Petroleum Admin. Order 11 (requiring a vertical |

| | |
|---|---|
| "directional drilling from land pads or platforms" Ex. 1, Report, at 82. | well bore (at pp.6, 7) and including restrictions on expenditures for gathering lines); Ex. 17, Records of the PAW, at 1 ("Petroleum Admin. Order No. 11 provides that a well is to be drilled with due diligence to maintain a vertical well bore. Therefore, before the well is intentionally directionally drilled or directionally redrilled an exception to Petroleum Admin. Order No. 11 must be obtained.") |
| Defendants failed to "shorten flowlines using field layout development…excessive length of the flowlines increased the back pressure on the wellheads" Ex. 1, Report, at 83. | Ex. 50, Conservation Order M-68, issued by the War Production Board December 23, 1941 (prohibited acquisition or use of materials for drilling wells not conforming to uniform spacing patterns of one well per 40 acres, except on specific approval) |
| "Texaco's strategy of developing the field by marine operations with *long distances* between wellheads and the tank battery was an inadequate and inefficient method that resulted in problems with fluid dynamics causing excessive equipment failures and pollution." Ex. 1, Report, at 13. | Ex. 16, *Fightin' Oil* at 89 ("The Petroleum Administration has sought to eliminate the drilling of all unnecessary wells – unnecessary purely in the sense that they would represent a relatively ineffective use of steel. This is accomplished by the issuance of regulations as to the spacing of wells. These regulations were designed to prevent the drilling of wells virtually on top of one another as too frequently had been the competitive practice."); Ex. 34, Legal opinion from the Dep't of Interior characterizing spacing regulations as "in furtherance of the powers conferred upon the President of the Second War Powers Act to take such appropriate measures as may be necessary to conserve steel and other materials which are utilized in drilling for oil and gas and which are essential in the prosecution of the war." |
| "the 24/7 nature of operations of the equipment generated accelerated wave action that erodes levees and destroys marshes." Ex. 1, Report, at 13. | Ex. 21, at 16-17, Records of Petroleum Admin. For War 1942-45, at 16 ("[I]it will be necessary to accelerate drilling activity from now on to the end of the year if the 1945 program of 27,000 wells is to be realised."); Ex. 35, Letter dated June 1945 ("So long as the PAW certifies a volume of oil is necessary for the prosecution of the war, the Commission can do nothing else but meet that certification."); Ex. 46, Oil & Gas Journal, May 5, 1945 ("current PAW quotas are pushing against the ceiling of the district's capacity to produce efficiently. But given sufficient steel and manpower to sustain the drilling program, preferably at an even higher rate than at present, these quotas can be maintained for another 6 months without harm. . . . Since production has conformed very closely with the PAW monthly crude quotas, it is possible to chart the history of the war demand for crude and its relationship to District 3 capacity to produce at maximum |

| | |
|---|---|
| | efficient rates."); Ex. 47, at 215, 1943 Department of Conservation Biennial Report ("all the states were asked to produce practically all the oil that could be taken without injury to the wells and reservoirs"). |
| "*inadequate amounts of cement were used in surface and production casing*. These measures show that Texaco had little or no regard for designing long life equipment, resulting in failures that caused leaks and spills that caused pollution." Ex. 1, report, at 14. | Ex. 39, Records of PAW, Letter from Asst. Chief Counsel, November 16, 1943 ("I am advised you have instructed members of Production Division that PAW…does not have the right to require operators to use a *specified size of casing* …. If [that] is correct, I *cannot agree with this instruction or interpretation*…. It is within the province of PAW…to refuse to permit an operator to acquire casing of one size as against casing of another size, likewise to refuse to permit an operator to acquire casing of one character, such as an alloy steel, as against casing of another character, such as a carbon steel."); Ex. 30, (Preference Rating Order P-98b provides that "No operator may apply a rating assigned by this Order to obtain material the use of which may be eliminated by substitution of less source material or by change of design without serious loss of efficiency"); Ex. 32 (demonstrating that all activity has to be justified as supporting the public interest and war effort); Ex. 38, at 3, Records of PAW, Legal Interpretations and Operating Instructions (describing $500 material cost limitation on maintenance or repairs). |
| Describing Defendants' alleged failure to conduct pressure maintenance operations: "23 million barrels of oil, 180 BCF of gas, and over 110 million barrels of produced water were removed from these reservoirs thereby creating large volumes of voidage of reservoir pore space…. The overburden pressure on these reservoirs has compacted…the ground surface has moved vertical downward to weaken the surface soils and land." Ex. 1, Report, at 56. | Ex. 37, at 1, Records of PAW, Letter from Chief Counsel ("unrestricted drilling of injection wells in connection with pressure maintenance operations…is contrary to the express language of Supplementary Order No. 6 which on its face excludes pressure maintenance operations from the provisions of that order."); Ex. 21, at 16-17, Records of PAW ("[I]t will be necessary to accelerate drilling activity from now on to the end of the year if the 1945 program of 27,000 wells is to be realised."); Ex. 46, Oil & Gas Journal, May 5, 1945 ("current PAW quotas are pushing against the ceiling of the district's capacity to produce efficiently"). |
| "[P]roduced water from 1941 to 1993 was discharged overboard instead of putting | Ex. 41, at 26, Petroleum Admin. Order issued June 30, 1943 (permitting secondary recovery methods (production and injection wells) only in the case that they are used to |

| | |
|---|---|
| the produced water back into the reservoirs to minimize voidage and subsidence." Ex. 1, Report, at 57. | increase or sustain production; excludes materials to be used for pressure maintenance or salt water disposal operations.) |

**D.    Defendants have a colorable federal defense.**

Finally, Defendants have multiple federal defenses to the Plaintiffs' claims described in the Report.  For example, certain Defendants should be entitled to governmental immunity for conduct directed by the federal government, such as the conduct described in the Report. *Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988) (describing defense to apply where "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States."). As explained, the federal government controlled virtually every aspect of exploration and production activities during the early years of development in Louisiana's coastal zone, and many of the activities being imputed to Defendants under theories of "solidary liability" and "cumulative impacts" were carried out under governmental direction.[2]

Further, federal law preempts the relief Plaintiffs seek in both the petitions (at Prayer, "actual restoration of the Parish coastal zone") and the Report (at 133, backfilling of all canals). For instance, the Clean Water Act prohibits "the discharge of any pollutant by any person" without a permit (33 U.S.C. § 1311(a)), and the Rivers and Harbor Act similarly prohibits the filling of tidelands or channels without a permit (33 U.S.C. § 403).[3] Numerous courts have found

---

[2] Defendants dispute plaintiffs' theories of solidary liability or "cumulative impacts" and will challenge those theories in future proceedings at the appropriate time.

[3] That Defendants could seek federal permits to enable them to "refill" the canals as demanded here is irrelevant to this preemption analysis, because the pertinent question is whether Defendants have the *independent* ability to comply with state law as Plaintiffs have articulated it,

that preemption is a colorable federal defense for purposes of federal officer removal. *See, e.g.,*
*Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1235 (8th Cir. 2012) (colorable federal defense of
preemption based on Federal Employees Health Benefits Act); *Pretlow v. Garrison*, 420 F.
App'x 798, 801-02 (10th Cir. 2011) (colorable federal defense founded in part on preemption via
federal employment statutes); *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership
Corp.*, 484 F.3d 380, 391 (6th Cir. 2007) (Rural Electrification Act); *Smith v. Collection Techs.,
Inc.*, 2016 WL 1169529, at *5–6 (S.D.W. Va. Mar. 22, 2016) (Higher Education Act).

Moreover, because Plaintiffs assert claims for pre-SLCRMA activities that were
governed by federal law at the time they were conducted, Defendants also would have the
colorable federal defense that their activities prior to the enactment of SLCRMA were carried out
in compliance with applicable federal statutes, regulations and orders and that Defendants
therefore cannot be held liable under SLCRMA for those "lawfully commenced" activities.  This
colorable defense will necessarily require interpretation of the federal law that applied to
Defendants' activities prior to SLCRMA's enactment, in order to assess Defendants' compliance
with federal law.  *See also infra* at III.

> **E.    Plaintiffs' solidary liability theory reinforces federal jurisdiction under
> § 1442.**

In the Report and many other of the parish cases, a named Defendant or its predecessor
performed the federally directed wartime activities. But even if that were not the case, Plaintiffs
seek to hold Defendants "solidarily liable" for allegedly harmful conduct that was directed by a
federal officer. Indeed, in each case Plaintiffs seek "actual restoration" of the entire "Parish
Coastal Zone" under a theory that the "cumulative impacts" of federally directed activities,

---

which they clearly do not. *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011); *Mut. Pharm.
Co. v. Bartlett*, 133 S. Ct. 2466, 2488 n.4 (2013).

including during a time of war, rendered Defendants' later actions unlawful. Ex. 2, Pet., Prayer para. (c); *see also* Ex. 1, at 116. Plaintiffs' allegations in the Report, directed to wartime or other national emergency activities, describe alleged harm to the coastal zone that the Report claims would not be confined solely to the operational area that is the focus of that Report. World War II was the genesis of increased oil exploration and production in every parish where the Plaintiffs demand that Defendants must "restore the . . . Parish Coastal Zone to original condition." Accordingly, with Plaintiffs finally showing their hand in the Report, removal of these cases is proper.

In addition or in the alternative, even if any of the conduct described above was conducted under circumstances deemed insufficient to qualify for federal officer removal, any conduct, or the claimed "cumulative impact" of such conduct, for which Defendants are alleged to be "solidarily liable," was nevertheless conducted during a national emergency or crisis when federal law exclusively governed the challenged conduct. As such, assessing Defendants' "bad faith," the availability of alternative "best practices," or the scope of liability for "cumulative impacts" requires an interpretation of federal law and presents a substantial federal question under 28 U.S.C. § 1441 and the test more fully described below.

### III.   Plaintiffs' allegations in the Report give rise to federal question jurisdiction.

This case is also removable because this Court would "have original jurisdiction" over it. 28 U.S.C. § 1441(a). This court has federal question jurisdiction over any civil action that "arises under the federal constitution, statutes, or treaties." 28 U.S.C. 1331. A federal question exists where "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Bd. of Commissioners*, 850 F.3d at 721–22. Removal may be based on "resolution

31

of a substantial question of federal law" where "(1) resolving a federal issue is necessary to resolution of the state-law claim; (2) the federal issue is actually disputed; (3) the federal issue is substantial; and (4) federal jurisdiction will not disturb the balance of federal and state judicial responsibilities." *Id.* at 722 (citing *Grable & Sons Metal Prods. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005)). "[I]f a plaintiff files suit in state court alleging both federal and state claims arising out of the same controversy, the entire action may be removed to federal court." *Id.*; *see also Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005) ("A single claim over which federal-question jurisdiction exists is sufficient to allow removal.").

The unprecedented breadth of the allegations set forth in the Report, and the need to interpret federal law in order to prove the "violations" that Plaintiffs allege, serve to establish each of these elements.

**A. Plaintiffs' claims in the Report raise federal issues.**

As explained above, the Report makes clear that Plaintiffs' claims target activities that took place well before SLCRMA was enacted in 1980. For example, Plaintiffs seek to hold Defendants liable for building canals, yet acknowledge that "[b]y 1979 the oil and gas canal network was almost entirely developed." Ex. 1, at 5. SLCRMA on its face exempts such pre-SLCRMA activities, providing that "uses legally commenced or established prior to the effective date of the coastal use permit program shall not require a coastal use permit." La. Stat. Ann. § 49.214.34(c)(2). According to Plaintiffs, however, Defendants' pre-SLCRMA activities are excluded from this statutory exemption for two independent reasons: (1) because they were commenced "in bad faith," or (2) because their impacts "significantly changed" after SLCRMA. For Plaintiffs to prove either theory of liability, a court must interpret federal law. In particular, Plaintiffs' theory requires them to establish that (1) activities conducted prior to SLCRMA were

commenced in "bad faith" at a time when the applicable standards were exclusively *federal* in nature, or (2) pre-1980 activities had "significantly *changed* impacts" after 1980, which requires first defining the baseline of allowable impacts in the pre-1980 permits or authorizations—which were also a matter of *federal* law. Determining the applicability of each of Plaintiffs' two posited exceptions will require a court to construe and resolve federal issues—namely, the scope and requirements of federal laws and federal dredging permits—and thus each independently provides a basis for removal to federal court.

It is immaterial that the Report fails to cite or rely on the applicable federal laws or regulations. A party cannot avoid removal simply by avoiding reference to federal laws implicated by the party's claims. *Hughes v. Chevron Phillips Chem. Co. LP*, 478 F. App'x 167, 171 (5th Cir. 2012) ("Though [plaintiff] has tried to frame his claims as sounding only in state law, any judicial consideration of those claims necessarily implicates substantial questions of federal law."). Instead, "Supreme Court precedent is clear that a case arises under federal law where 'the vindication of a right under state law necessarily turn[s] on some construction of federal law,'" which is the case here. *Bd. of Commissioners*, 850 F.3d at 723 (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9 (1983)).

*First*, the Report's claim that pre-1980 dredging constitutes "bad faith" is closely analogous to the federal question resolved by the Fifth Circuit in the *Levee Board* case. The Report cites no state law standards applicable to dredging (at any time, much less before 1980), and that is unsurprising; the Fifth Circuit's *Levee Board* opinion found there was no Louisiana state law "standard of care" applicable to the far more recent dredging activity at issue in that case (which was alleged to have been merely "negligent" as opposed to affirmatively conducted "in bad faith"). *Bd. of Commissioners*, 850 F.3d at 723 ("The absence of any state law grounding

for the duty that the Board would need to establish for the Defendants to be liable means that that duty would have to be drawn from federal law.").

SLCRMA provides no standards for assessing whether it was "bad faith" to dredge a canal in the four decades predating its effective date. Plaintiffs have affirmatively disclaimed any allegations premised on Louisiana "tort law, contract law, mineral law, or property law." Ex. 2, Pet. at 33(t). The only substantive standards conceivably applicable prior to 1980 would derive from federal law—federal dredging permits, federal authorizations, federal regulations, the federal Rivers and Harbors Act and the federal Clean Water Act. Ex. 10, at 8 ("Specific State authority for the proposed work is *not required*.") (emphasis added); Ex. 11 at 6 ("specific state authority for the proposed work is not required"). As such, this dispute necessarily concerns whether *federal* law prior to 1980 created duties that would require Defendants to avoid dredging, the scope of those duties, and whether Defendants violated any such duties. That is a substantial question of federal law. *See Board of Commissioners*, 850 F.3d at 724.

Plaintiffs' attempt to establish "bad faith" based on Defendants' alleged failure to follow certain supposed "industry best practices" merely underscores their necessary reliance on federal law. Not only must Plaintiffs prove that federal law created such a duty, they must also demonstrate that the alternative "best practices" that Defendants allegedly should have used were *actually legally available*, which itself is a question of federal law. Where the activity in question is regulated exclusively by federally law—as all pre-1980 dredging was—a court must interpret those federal laws and regulations to determine the availability of each "best practice" alternative.

For example, Plaintiffs allege that Defendants could and should have used "directional drilled wells from centralized locations that are on platforms or *manmade* islands." Ex. 1, at 126.

34

Plaintiffs further assert that a "number of roads" could and should have been built by Defendants "to central areas where land operations could be conducted," and from there "[d]irectional drilling from four or five main well pads" could have been carried out without the need for dredging or long flowlines. Ex. 1, Report at 127.  But for decades prior to the enactment of SLCRMA, "Section 10 of the River and Harbor Act of March 3, 1899, prohibit[ed] the placing of any structures in or over any navigable waters of the United States, or excavating or depositing material herein, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War." 33 CFR § 209.130(a)(1) (1946). And under the Rivers and Harbors Act, creating a "manmade island" or centralized drilling platforms would have required federal approval, if it implicated navigable waters of the United States. *See id.*[4] Demonstrating that Defendants could have sought and been granted approval for such activities within the confines of the Rivers and Harbors Act and federal wartime orders, will require construing these federal laws and regulations.  Plaintiffs' "bad faith" theory thus presents a federal question and supports removal of this case.

**Second**, the Report's distinct claim that a "significant change" in the "impacts" of lawful pre-SLCRMA activities can subject Defendants to liability separately requires interpretation of federal law and thus independently supports removal. Plaintiffs acknowledge that all coastal uses lawfully commenced before 1980, which were still in existence when SLCRMA was adopted, and which continued after 1980, did not require a coastal use permit. Ex. 1, Report at 34. However, Plaintiffs allege that if the impacts "significantly changed" after 1980, then this exemption does not apply (*i.e.*, the change in impact negated the initial exempt status). *Id.* at 28.

---

[4] The creation of federal standards for such works, and the requirement of federal permits to execute them, was even more broadly established under section 404 of the Clean Water Act beginning in 1972.

But to prove that the impacts "significantly changed," Plaintiffs must demonstrate that the impacts significantly exceeded the permissible impacts allowed for and approved by the federal government as of 1980. In other words, Plaintiffs' theory necessarily incorporates a federal baseline against which post-1980 impacts must be measured. And determining that federal baseline will require interpreting federal dredging permits and regulations, which this Court has already found presents a substantial federal question. *See Levee Board*, 29 F. Supp. 3d at 858–59 (addressing a claim not reached by the Fifth Circuit on appeal—namely, that the defendants had breached their federal permits—and finding that *Grable* removal was appropriate because the claim turned on the construction and interpretation of federal permits, which is a question of federal law). Indeed, if Plaintiffs' theory did not involve an assessment of the federal baseline, it would eviscerate the statutory exemption for pre-1980 activities by requiring a coastal use permit for *any* post-1980 impact, no matter how small, of the federally approved activity.

By way of example, Plaintiffs allege that the construction, operation, and maintenance of canals caused impacts that exceeded the canal permits issued by the federal government. Ex. 1, Report at 36-52. Proof of this allegation will necessarily turn on first defining what the federal permit required. Indeed, the Report identifies "direct loss from channel construction and operation" as one of the claimed changed "impacts from *continued* operation of the canals," Ex. 1, at 40 (emphasis added). To the extent that channel construction and operation necessarily results in direct loss, as alleged in the Report, the federal permits authorizing such construction and operation must have encompassed this impact. Thus, to show that the impact has "changed" requires establishing the extent of the direct loss that was allowed under the federal permits as a baseline. Similarly, the Report identifies as a changed impact "indirect loss from altered hydrology" (*id*. at 41) which the Report alleges is the result of how the canals were constructed

and the placement of spoil banks. To show that indirect loss from altered hydrology is a "changed" impact, Plaintiffs must first establish the extent to which this (in their view) inevitable consequence of the construction of the canals and placement of spoil was encompassed in the federal permits for those activities.

For instance, a 1971 permit allowed Chevron to "dredge and maintain a canal," and specified the manner of doing so. Ex. 45, at 015959. The permit was further conditioned on Chevron "maintain[ing] the work authorized" and required Chevron to conduct such maintenance "in a manner so as to minimize any adverse impact of the construction or work on fish, wildlife and natural environmental values." Ex. 45, at 015961. Plaintiffs would thus have to demonstrate that Defendants' impacts exceed those specifications and conditions that the federal government placed on the activity. Otherwise, Chevron would be in violation of the permit. But of course, whether Chevron is or is not in violation of a federal permit is a matter of federal law. *See, e.g., See Levee Board*, 29 F. Supp. 3d at 858–59; *Shriners v. United States*, No. 14-CV-1437 AJB (KSC), 2017 WL 3412299, at *5-6 (S.D. Cal. Aug. 8, 2017).[5]

---

[5] Moreover, the Report includes federally permitted activities for which the State issued an NDSI. For such activities, the state had the opportunity before the federal permit issued to object to or regulate the activity, but declined to do so because the activity would have "no direct and significant impact" on coastal areas. Federal regulations provide a process, involving NOAA, whereby a state, having acquiesced to federally authorized activity, can later alter its decision based on perceived changes in impacts. Plaintiffs did not follow this process here. *See* 15 C.F.R. § 930.65(b) (the State "shall notify" the relevant Federal agency if the State claims that a federally permitted activity that was previously determined to be consistent with the State management program, "is having an effect on any coastal use or resource substantially different than originally described and, as a result, is no longer consistent with the management program" or that an activity previously determined not to affect any coastal use or resource later has "coastal effects substantially different than originally described and, as a result, [is] inconsistent with the management program."). Even assuming that a court could adjudicate this dispute without requiring the state to submit to NOAA's administrative process, the court would have to look to NOAA regulatory standards to do so. *See* 15 C.F.R. § 923.3(e)(1) (CZMA program decisions must provide "[a] clear understanding of the contents of the program, especially in identifying who will be affected by the program and how."); *id.* § 923(e)(2) (CZMA program

Finally, many of the activities the Report now challenges occurred during a time of war or national emergency when the operations at issue were exclusively governed by detailed laws, regulations, directives and orders promulgated by the federal government. Plaintiffs' theory of liability in the Report seeks to hold Defendants solidarily liable for the "cumulative impacts" of activities conducted during multiple national emergencies predating SLCRMA—conduct governed by federal law—and accordingly necessarily raises issues of federal law. For at least these reasons, Plaintiffs' reliance on a "changed impacts" or "bad faith" exception to the SLCRMA exemption for pre-SLCRMA activities "necessarily turn[s] on some construction of federal law." *See Bd. of Commissioners*, 850 F.3d at 724. Removal is thus independently warranted on this basis.

**B. The Federal Issues Are Disputed.**

Defendants do not concede that their activities were conducted in "bad faith," or that the Clean Water Act or the Rivers and Harbors Act would have permitted the "alternatives" the Report cites, or that the Petroleum Administration for War would have permitted the "alternatives" the Report cites, or that their federally approved activities resulted in significantly changed "impacts" beyond the scope of the federally approved impacts. To the contrary, these issues are central to the dispute between the parties in this case, and they are hotly contested, as reflected in the recently served Report.

**C. The Federal Issues Are Substantial.**

The substantiality inquiry is easily met here. The Report challenges all energy development—an issue of national concern—since the earliest discovery in six coastal parishes. The Federal Coastal Zone Management Act states that "[t]here is a national interest in the

---

decisions must provide "[a] clear sense of direction and predictability for decisionmakers who must take actions pursuant to or consistent with the management program.").

38

effective management, beneficial use, protection and development of the coastal zone." (Sec. 302(a)). The Report seeks to impose retroactive liability for conduct undertaken with explicit federal authorization, encouragement and even federal insistence. The Defendants represent an entire industry. The lawsuits are a direct attack on activities undertaken during a time of war, and later pursuant to express federal authorization. The "validity of the [Plaintiffs'] claims would require that conduct subject to an extensive federal permitting scheme," and subject to periods of exclusive federal regulation, are "in fact subject to implicit restraints that are created by state law." *Bd. of Commissioners*, 850 F.3d at 724. As the Fifth Circuit has already concluded in a similar (albeit less ambitious) case: "The implications for the federal regulatory scheme of the sort of holding that [the Plaintiffs] seek would be significant, and the issues are thus substantial." *Id.*

### D. Federal jurisdiction will not disturb the balance of federal and state judicial responsibilities.

As the Report has now made clear, this lawsuit is not really a "permit enforcement" lawsuit under SLCRMA. It is an unprecedented attempt to transform a narrow quasi-criminal state permitting statute, that took effect in 1980, into a referendum on all energy industry development in coastal Louisiana since time immemorial. The claims in the petitions are identical, changing only the name of the Defendants and the geographic boundary. The claims are subject to similar defenses, many of which should be dispositive. Where, as here, one of the primary subjects of dispute between the parties is whether the federal laws in question may properly be interpreted to create rights and duties under state law, "the implications for the federal docket are less severe." *Id.* at 725. As the Fifth Circuit noted, in language equally applicable here: "[T]he scope and limitations of a complex federal regulatory framework are at stake in this case, and disposition of the question whether that framework may give rise to state

law claims as an initial matter will ultimately have implications for the federal docket one way or the other." *Id.*

**IV.     The Court should exercise supplemental jurisdiction.**

Section 1367 confers "a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005). "The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties." *Id.*   Defendants respectfully ask the court to exercise its supplemental jurisdiction over any claims deemed not to be within the court's original jurisdiction.

**V.     Defendants' prior removal notices provide independent grounds for exercising subject matter jurisdiction.**

Defendants previously removed the parish cases on one or more of the following grounds: (1) Outer Continental Shelf Lands Act ("OCSLA"), 42 U.S.C. § 1349(b)(1); (2) general maritime law; (3) federal enclave jurisdiction, 28 U.S.C. § 1331; and (4) federal question jurisdiction, 28 U.S.C. § 1331, 1441. Defendants' re-assert these grounds and incorporate their prior briefing and arguments, as if fully restated here.

Finally, removal under § 1442(a) does not require the consent of co-Defendants. *See Humphries v. Elliott Co.*, 760 F.3d 414, 417 (5th Cir. 2014).

All properly joined and served defendants have granted consent and copies of written consent will be submitted within the deadline for removal. (See Ex. 51, *in globo* consents).

Defendant, Graham Royalty LTD is in final liquidation.  Further, Plaintiffs have never sought preliminary default against this defendant, and, therefore, have abandoned their claims

against it.  Consequently, Graham Royalty LTD is a nominal defendant such that consent is not required.

Defendant, Riverwood Production Company's license to do business was revoked by Louisiana's Secretary of State on November 19, 1990, and it was not served in this matter. Upon information and belief, Riverwood Production Company owns no property or assets, has no employees, has no remaining shareholders, has no remaining managers, and has no physical office location.  Further, Plaintiffs have never sought preliminary default against this defendant, and, therefore, have abandoned their claims against it.  Consequently, Riverwood Production Company is a nominal defendant such that its consent is not required and could not be obtained.

Per the Clerk's instruction to counsel on May 22, 2018, Counsel has e-filed the Petition for Damages and any amending petitions filed in State Court in this matter and will hand deliver a copy of the state court record to the Court.

Respectfully submitted:

KEAN MILLER LLP

*/s/ Shannon Shelton Cobb*
Michael R. Phillips (#21020)
mike.phillips@keanmiller.com
Brett P. Fenasci (#29858)
brett.fenasci@keanmiller.com
Claire E. Juneau (#33209)
claire.juneau@keanmiller.com
Shannon Shelton Cobb (#34762)
shannon.cobb@keanmiller.com
909 Poydras Street, Suite 3600
New Orleans, LA 70112
Telephone:  (504) 585-3050
Facsimile:  (504) 585-3951

-and-

41

KEAN MILLER LLP
Charles S. McCowan, III (#19699)
trey.mccowan@keanmiller.com
Pamela R. Mascari (#25162)
pam.mascari@keanmiller.com
II City Plaza
400 Convention St., Suite 700
Post Office Box 3513 (70821)
Baton Rouge, Louisiana 70802
Telephone: (225) 387-0999
Facsimile: (225) 388-9133

-and-

SUSMAN GODFREY L.L.P.
Eric J. Mayer (#14184)
emayer@susmangodfrey.com
Alexandra White (#29478)
lwhite@susmangodfrey.com
Johnny C. Carter (#37985)
jcarter@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Facsimile:  (713) 654-6666

*Attorneys for Defendant Chevron U.S.A. Inc.*

*/s/ Robert McNeal*
Robert B. McNeal (No. 14211)
rbmcneal@liskow.com
**LISKOW & LEWIS**
One Shell Square
701 Poydras Street, Suite 5000
New Orleans, Louisiana 70139-5099
Telephone:  (504) 581-7979
Facsimile:  (504) 556-4108

Michael P. Cash (No. 31655)
mcash@liskow.com
**LISKOW & LEWIS**
First City Tower
1001 Fannin Street
Houston, Texas  77002-6756
Telephone:  (713) 651-2900
Facsimile:  (713) 651-2908

42

-and-

Jamie D. Rhymes (No. 24621)
jdrhymes@liskow.com
**LISKOW & LEWIS**
822 Harding Street
Lafayette, Louisiana 70503
Telephone:  (337) 232-7424
Facsimile:  (337) 267-2399

-and-

Martin A. Stern (No. 17154)
martin.stern@arlaw.com
Glen M. Pilié (No. 1539)
glen.pilie@arlaw.com
Jeffrey E. Richardson (No. 23273)
jeffrey.richardson@arlaw.com
Alexandra G. Roselli (#37847)
alexandra.roselli@arlaw.com
**ADAMS AND REESE LLP**
701 Poydras Street, Suite 4500
New Orleans, Louisiana 70139
Telephone:  (504) 581-3234
Facsimile:  (504) 566-0210

-and-

Roy C. Cheatwood (No. 04010)
rcheatwood@bakerdonelson.com
Monica A. Frois (No. 20187)
mfrois@bakerdonelson.com
Matthew A. Woolf (No. 27146)
mwoolf@bakerdonelson.com
Tyler L. Weidlich (No. 30790)
tweidlich@bakerdonelson.com
**BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000

*Attorneys for Exxon Mobil Corporation*

43

KUCHLER POLK WEINER, LLC

*/s/ Michele DeShazo*
Deborah D. Kuchler, T.A. (#17013)
Robert E. Guidry (#28064)
Sarah E. Iiams (#22418)
Michele Hale DeShazo (#29893)
1615 Poydras Street, Suite 1300
New Orleans, LA  70112
T. 504-592-0691
F. 504-592-0697

*Attorneys for ConocoPhillips Company*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served on all known counsel of record by depositing same in the U.S. Mail, properly addressed and postage prepaid, and/or by email this 23rd day of May, 2018.

*/s/ Shannon Shelton Cobb*