UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

THE PARISH OF PLAQUEMINES                        CIVIL ACTION

v.                                               NO. 18-5217

RIVERWOOD PRODUCTION CO., ET AL.                 SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court are motions to remand by Plaquemines Parish and the State of Louisiana.  For the reasons that follow, the motions are GRANTED.

**Background**

This case is one of many seeking to determine the oil and gas industry's responsibility (and consequent restoration obligations) for the rapid loss and deterioration of Louisiana's coastal wetlands.  For a second time, this Court must determine whether these cases belong in federal court.

Louisiana coastal parishes[1] filed this and 41 other lawsuits in state court against more than 200 oil and gas companies alleging that dredging, drilling, and waste disposal caused coastal land

---

[1] The parish plaintiffs include Plaquemines, Jefferson, Cameron, Vermillion, St. Bernard, and St. John the Baptist.  Each parish filed suit on its own behalf and in most if not all cases, the State of Louisiana through the Attorney General and through the Department of Natural Resources intervened as plaintiffs to protect the State's interests.

loss and pollution; the plaintiffs allege a singular statutory cause of action for violation of Louisiana's State and Local Coastal Resources Management Act of 1978 (the CZM Act or the SLCRMA). Louisiana Revised Statute § 49:214.36(D) provides a cause of action against defendants that violate a state-issued coastal use permit or fail to obtain a required coastal use permit.[2] Among the exemptions from coastal use permitting requirements are uses which do not have a significant impact on coastal waters (La.R.S. § 49:214.34(A)(10)) and activities "lawfully commenced" prior to the SLCRMA's enactment (La.R.S. § 49:214.34(C)(2)("Individual specific uses legally commenced or established prior to the effective date of the coastal use permit program shall not require a coastal use permit.")).

It is the public policy of the State of Louisiana "[t]o protect, develop, and where feasible, restore or enhance the resources of the state's coastal zone." La.R.S. § 49:214.22(1). The SCLRMA regulates certain "uses" ("any use or activity within the coastal zone which has a direct and significant impact on coastal waters," Louisiana Administrative Code (L.A.C.), Title 43,

---

[2] Paragraph D of La.R.S. § 49:214.36 authorizes local governments to seek injunctive or declaratory relief to ensure permitted uses; paragraph E states that "[a] court may impose civil liability and assess damages; order...restoration costs; require...actual restoration[;] or otherwise impose reasonable and proper sanctions for [unauthorized] uses[; t]he court in its discretion may award costs and reasonable attorney's fees to the prevailing party."

Part I, § 700)[3] within the coastal zone and authorizes local governments with approved programs to enforce the Act to ensure that the only uses made of the coastal zone are those authorized by a permit. The defendants' oil and gas exploration, production, and transportation activities in the coastal parishes, it is alleged, have contributed to coastal land loss, pollution, and other damage.[4] Each lawsuit involves oil and gas operations

---

[3] A "direct and significant impact" is "a direct and significant modification or alteration in the physical or biological characteristics of coastal waters which results from an action or series of actions by man." L.A.C. 43:I.700.

[4] The plaintiffs allege that the defendants' activities have violated implementing regulations, including those that require restoration of production sites upon termination of operations and require construction and operation of drilling sites using techniques to prevent the release of pollutants, as well as those that prohibit disposal of radioactive waste in the coastal zone. Specifically, it is alleged that the defendants' construction, use, and failure to close unlined earthen waste pits violate the CZM Act and regulations; that, if any waste pit was legally commenced prior to 1978, the continued existence of such waste pit constitutes a new use for which coastal use permit was required; that the defendants never obtained the required state or local coastal use permit for the closure or post-CZM operations of their waste pits; that the defendants neither restored areas with pits to their original condition nor constructed the pits using the best practical techniques to prevent leaching; and that defendants have disposed of oil field wastes from their waste pits without permits. The plaintiffs also allege that "[s]ince 1978 and before, Defendants' oil and gas activities have resulted in the dredging of numerous canals[, which have] exceeded the limits of coastal use permits[;]" that the defendants' failure to adequately design or maintain these canals have caused erosion of marshes, degradation of terrestrial and aquatic life, and "has increased the risk of damage from storm-generated surges and other flooding damage, and has enabled and/or accelerated saltwater intrusion[;]" and that the defendants have failed to restore these canals to their original condition.

conducted in a different Operational Area and is brought against a different but often overlapping cast of defendants.[5]    The plaintiffs seek recovery of damages, costs necessary to restore the coastal zone, actual restoration, and reasonable costs and attorney's fees.

In their state court petitions, the plaintiffs strategically "limit the scope of the claims and allegations of this petition" to a state law cause of action under the SLCRMA and accompanying state and local regulations.[6]    The plaintiffs expressly disclaim any federal claims (singling out their intention to disavow any right to relief under federal law such as the Rivers and Harbors Act, the Clean Water Act, any federal regulations, any claim under general maritime or admiralty law).[7]

---

[5] This particular lawsuit concerns activities and operations by six defendants (Riverwood Production Company, Inc., Chevron U.S.A. Inc., Exxon Mobil Corporation, ConocoPhillips company, Estate of William G. Helis, and Graham Royalty, Ltd.) associated with the development of the Potash Oil & Gas Field in Plaquemines Parish, which the Parish contends have caused substantial damage.

[6] To the extent that defendants' operations were not lawfully commenced or established prior to the implementation of the CZM, the plaintiffs nevertheless allege that "[t]he complained-of operations and activities were prohibited prior to 1978 by various" other provisions of Louisiana state law.

[7] The plaintiffs provide a comprehensive list of claims they submit that they purposefully do not advance in their state court petition.    They single out several federal statutes and more generically disclaim any attempt to recover for any defendant's violation of a federal permit or any activity on the Outer Continental Shelf.

Notwithstanding these disclaimers, the defendants removed these parish coastal zone cases to this Court and to the Western District of Louisiana, initially alleging four bases for jurisdiction: diversity jurisdiction; Outer Continental Shelf Lands Act; general maritime law; or federal question jurisdiction. The Court rejected all asserted bases of removal jurisdiction and remanded the cases to state court. See, e.g., Parish of Plaquemines v. Total Petrochemical and Refining USA, Inc., 64 F. Supp. 3d 872 (E.D.La 2014); Parish of Plaquemines v. Hilcorp Energy Co., No. 13-6727, 2015 WL 1954640 (E.D. La. April 29, 2015); Parish of St. Bernard v. Atlantic Richfield Co., No. 16-16294, 2017 WL 2875723 (E.D. La. July 6, 2017).

Back in state court, the defendants filed motions requesting that the plaintiffs identify the alleged state law violations underlying the lawsuits. The cases were progressing (some even toward early 2019 trial dates) when, on April 30, 2018, the plaintiffs issued a Preliminary Expert Report on Violations in the related Parish of Plaquemines v. Rozel Operating Co. case.[8] Rather than identifying clear-cut state permitting violations, the

---

[8] April 30 was the deadline for plaintiffs to provide preliminary expert reports detailing the description of the specific SLCRMA violations including specific instances of permit violations or failures to obtain permits. The Expert Report was certified by the Louisiana Department of Natural Resources and, thus, the defendants contend, the Report is the DNR's official position for all cases.

defendants submit, the Rozel Report revealed that the plaintiffs "primarily attack activities undertaken before the state permitting law at issue was effective and that were instead subject to extensive and exclusive federal direction, control, and regulation." The Rozel expert opines that three types of activities occurred within the Bayou Gentilly case operational area that violated SLCRMA:

> First, there were certain uses that were legally commenced before 1980 but whose impacts changed post-1980, triggering the requirement for a permit that was never obtained. Second, there were certain uses that were illegally commenced at their beginning and therefore did not qualify for the exemption from coastal permitting or review. And third, there were certain uses that were commenced after 1980 that did not receive appropriate permits under SLCRMA.

Contrary to the plaintiffs' persistent disclaimers, the defendants submit that the Rozel opinions reveal a federal dimension to the plaintiffs' claims, which "(1) implicate wartime and national emergency activities undertaken at the direction of federal officers, and (2) necessarily require resolution of substantial, disputed questions of federal law." The Rozel Report invokes language from a 1980 federal Final Environmental Impact Statement and, defendants contend, distorts the SLCRMA "lawfully commenced" exemption[9] to anchor liability to defendants' pre-SLCRMA

---

[9] La.R.S. § 49:214.34(C)(2) provides: "Individual specific uses legally commenced or established prior to the effective date of the coastal use permit program shall not require a coastal use permit."

activities.[10]    This sweeping view of defendants' permitting

violations, the defendants submit, is necessary to contend with

---

[10]  The Report invokes language from a 1980 federal Final
Environmental Impact Statement, which was submitted for proposed
federal approval of Louisiana's Coastal Resources Program:

> Any use or activity which, prior to the initiation of
> the coastal use permit program, has been lawfully
> commenced in good faith and for which all required
> permits have been obtained is consistent with the
> Coastal Management Program and no coastal use permit is
> required for it.... Moreover, such use or activity shall
> thereafter be consistent with the program even if
> renewals of previously issued permits become necessary
> or if new permits are required by other governmental
> bodies provided that there is no significant change in
> the nature, size, shape, location or impacts of the use
> or activity.

The FEIS authors added this gloss to the "lawfully commenced"
exemption, ostensibly to offer guidance on the types of activities
that would be exempt:

> To be so exempted, a use or activity must have met the
> following requirements prior to the date of the coastal
> use permit program:
> 1) Actual construction or operation of the use or
> activity must have been begun in good faith; and
> 2) All permits, licenses, and clearances required by
> governmental bodies must have been obtained and the use
> or activity must be in compliance with them; and
> 3) No significant change in the nature, size, location
> or impacts of the use or activity take place.

It is the plaintiffs' adoption of this construction of the
"lawfully commenced" exemption that the defendants say transforms
the state law claims into ones raising federal questions or
defendants.   That is, insofar as the defendants' alleged "bad
faith" conduct occurred pre-SLCRMA --  incidentally, when some
oil and gas infrastructure was completed -- and insofar as the
impacts of the defendants' use or conduct changed, it is the
plaintiffs' theory that the defendants will not be saved by the
"lawfully commenced" exemption of the SLCRMA.   That SLCRMA
required, but defendants failed to obtain, coastal use permits
come 1980.  And the defendants submit that these "bad faith" and
"changed impacts" theories are governed by federal law and
implicate World War II era conduct, when the federal government
directed the activities described in the plaintiff's Rozel Report.

the plaintiffs' expert's concession that "[b]y 1979 the oil and gas canal network was almost entirely developed." Insofar as liability attaches for bad faith practices, defendants assert there are no state law standards by which to assess "bad faith;" therefore, the defendants submit, such an inquiry raises a federal question, given that "bad faith" conduct (or conduct upon which a "cumulative impacts" theory is based) is all conduct that predates the SLCRMA and, thus, federally-authorized, directed, or controlled. The Rozel Report, the defendants insist, has profoundly transformed the nature and scope of these lawsuits.

And so, the defendants, for a second time, removed this and similar lawsuits to this Court and to the Western District of Louisiana. This time, the defendants invoke federal subject matter jurisdiction based on 28 U.S.C. § 1442 (the federal officer removal statute) and 28 U.S.C. § 1331 (the federal question statute).[11] The plaintiffs now move to remand.

---

[11] Shortly after round two notices of removal were filed, the Court stayed these proceedings pending a determination by the MDL Panel as to whether it would grant the defendants' motions to coordinate these cases. On July 31, 2018, the United States Judicial Panel on Multidistrict Litigation denied the energy company defendants' motion for centralization of these lawsuits pending in the Eastern and Western District of Louisiana. See In re Louisiana Coastal Zone Land Loss Litig., MDL No. 2856, 317 F. Supp. 3d 1346 (2018). The Court promptly granted motions to reopen these cases.

I.

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by'" the United States Constitution and conferred by Congress. <u>Gunn v. Minton</u>, 568 U.S. 251, 256 (2013)(citation omitted). Unless Congress expressly provides otherwise, a federal court may exercise removal jurisdiction over state court actions if the federal court would have original jurisdiction over the case -- that is, if the plaintiff could have brought the action in federal court from the outset. <u>See</u> 28 U.S.C. § 1441(a). For example, a district court has original jurisdiction over cases presenting for resolution a federal question: "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This "arising under" or "federal question" jurisdiction is one predicate for removal invoked by defendants here. Federal question jurisdiction generally "exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." <u>Caterpillar, Inc. v. Williams</u>, 482 U.S. 386, 392 (1987). The defendants also invoke the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which "is a pure jurisdictional statute in which the raising of a federal question in the officer's removal petition...constitutes the federal law under which the action against the federal officer arises for [Article III]

purposes." Zeringue v. Crane Co., 846 F.3d 785, 789 (5th Cir. 2017)(quoting Mesa v. California, 489 U.S. 121, 136 (1989)).[12]

Although the plaintiffs challenge removal in this case, the removing defendants must establish that federal jurisdiction exists at the time of removal and that removal was proper. See Manguno v. Prudential Prop. & Cas. Ins. Co., 276 F.3d 720, 723 (5th Cir. 2002); see also Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 397 (5th Cir. 1998). Remand is proper if the plaintiff timely identifies a procedural defect in removal; remand is mandated if at any time the Court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c). "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which (a federal) statute has defined." Victory Carriers, Inc. v. Law, 404 U.S. 202, 212 (1971)(citation omitted). Given the significant federalism concerns implicated by removal, the general removal statute is

---

[12] The well pleaded complaint rule does not preclude reliance on the federal officer removal statute if a colorable federal defense exists as to some claims and they otherwise meet the statute's four criteria. See Jefferson County, Ala. v. Acker, 527 U.S. 423, 431 (1999)("Under the federal officer removal statute, suits against federal officers may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law."); see also Zeringue, 846 F.3d at 789 (citations omitted)(the federal officer removal statute "permits a federal defense, which is generally statutorily impotent to establish subject matter jurisdiction, to serve as the federal question that endues the court with jurisdiction.")

strictly construed "and any doubt about the propriety of removal must be resolved in favor of remand." Gutierrez v. Flores, 543 F.3d 248, 251 (5th Cir. 2008)(citation omitted); Gasch v. Hartford Accident & Indem. Co., 491 F.3d 278, 281-82 (5th Cir. 2007)(citations omitted). Unlike the general removal statute, however, the federal officer removal statute must be liberally construed. See Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 147 (2007)("The words 'acting under' are broad, and this Court has made clear that the statute must be 'liberally construed.'"); see also City of Walker v. Louisiana, 877 F.3d 563, 569 (5th Cir. 2017)("federal officer removal under 28 U.S.C. § 1442 is unlike other removal doctrines: it is not narrow or limited."). Thus, although it remains defendants' burden to establish the existence of federal jurisdiction over this controversy, whether federal officer removal jurisdiction exists must be assessed "without a thumb on the remand side of the scale." Savoie v. Huntington Ingalls, Inc., 817 F.3d 457, 462 (5th Cir. 2016)(citations omitted).[13]

---

[13] The liberal construction afforded the federal officer removal statute is likewise afforded to determining whether a federal officer's removal is timely. See Morgan v. Huntington Ingalls, Inc., 879 F.3d 602, 607 and n.10 (5th Cir. 2018)(citing Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1253 (9th Cir. 2006)).

II.
*A.*

As a threshold matter, the plaintiffs challenge the timeliness of removal, arguing that removal was procedurally defective under 28 U.S.C. § 1446. The plaintiffs contend that they plainly set forth their cause of action and theory of recovery since the lawsuits' inception, and, thus, the plaintiffs' original and amended petitions and, at the latest, discovery motions filed years ago are the operative documents (if any) that should have triggered removal. The defendants counter that removal was timely accomplished within 30 days of receipt of the <u>Rozel</u> Report, which, they argue, clarified that federal issues are directly implicated. The dispute focuses on when the plaintiffs disclosed that pre-SLCRMA and World War II-era conduct was at issue or relevant to their permit enforcement claims.

28 U.S.C. § 1446 governs removal procedure. Subsection (b) pertains to documents that trigger the 30-day time limit for removal; it essentially provides a two-part test for determining whether a defendant timely removed depending on what sort of document triggered removal. <u>Id.</u>; <u>Bosky v. Kroger Texas, LP</u>, 288 F.3d 208, 209 (5th Cir. 2002); <u>Decatur Hosp. Authority v. Aetna Health, Inc.</u>, 854 F.3d 292, 297 (5th Cir. 2017)(citation omitted). <u>1)</u> If the "initial pleading *setting forth* the claim for relief

upon which such action or proceeding is based" is removable, then the defendant must file its notice of removal within 30 days from receipt of that initial pleading. 28 U.S.C. § 1446(b)(1)(emphasis added). This initial 30-day clock is triggered "only when that pleading *affirmatively reveals on its face* that" the plaintiff is asserting a cause of action based on federal law. See Bosky, 288 F.3d at 210 (citations omitted, emphasis in original); see also Leffall v. Dallas Indep. Sch. Dist., 28 F.3d 521, 525 (5th Cir. 1994)(citing Aaron v. National Union Fire Ins. Co., 876 F.2d 1157, 1160-61 (5th Cir. 1989)(An initial pleading sets forth a removable claim "when [it] reveals on its face that it contains an issue of federal law.")). 2) But, if the initial pleading does not set forth a removable claim, the defendant must file its notice of removal within 30 days after it receives "a copy of an amended pleading, motion, order or" some "other paper from which it *may first be ascertained* that the case is one which is has become removable." 28 U.S.C. § 1446(b)(3)(emphasis added). To start the clock under this "other paper" paragraph, the information supporting removal contained in the other paper "must be '*unequivocally clear and certain*[.]'" Bosky, 288 F.3d at 211 (describing this "bright-line" rule as one that should "discourage removals before their factual basis can be proven by a

preponderance of the evidence through a simple and short statement of the facts.").[14]

Removal is timely only if the federal question or federal officer basis on which defendants predicate jurisdiction did not appear in the case until the <u>Rozel</u> Report. An expert report constitutes "other paper." There is no quarrel about that in the abstract; indeed, courts have expansively construed the scope of

---

[14] Most commonly, this "other paper" framework applies to ascertain removability based on diversity jurisdiction; other paper may clarify whether the jurisdictional amount in controversy requirement is met. Looking beyond the complaint to "other paper" to ascertain whether a federal question is presented, however, is rare because to do so bypasses the well pleaded complaint rule. <u>See</u> <u>Eggert v. Britton</u>, 223 Fed. Appx. 394, 397 (5th Cir. 2007)(determining that removal on the basis of statements in "other paper" is "inconsistent with the well-pleaded complaint rule and the intent of § 1446(b)" where references to federal law in other paper fails to "clarify any possible federal nature of the claims made in the pleadings"). Nevertheless, in the rare case in which the Court is called on to ascertain whether "other paper" reveals that a case presents a removable federal question, the Court considers whether the paper clarifies that the plaintiff's existing claims are truly federal in nature. <u>Id.</u> The parties do not brief this issue, perhaps because some courts characterize the federal question theory presented here as an exception to the well pleaded complaint rule. <u>But</u> <u>see</u> <u>Plains Capital Bank v. Rogers</u>, 715 Fed. Appx. 325, 328 (5th Cir. 2017)("Regardless of which form the federal question takes, every complaint is subject to a basic gatekeeping principle: the well-pleaded complaint rule.")(citing <u>Empire Healthchoice Assurance, Inc. v. McVeigh</u>, 547 U.S. 677, 689-90 (2006)). Or, perhaps because, to determine whether the defendants timely removed under the federal officer removal statute, the well pleaded complaint rule does not apply; the issue simply is when did the plaintiff disclose facts to trigger federal officer removal. Nevertheless, the well pleaded complaint rule coupled with the strict construction of the general removal statute informs whether the defendants properly removed on federal question grounds.

the "other paper."[15]  Insofar as the plaintiffs identify earlier

potential "other paper" that they argue should have triggered the

removal clock, the Court considers only "'other paper' ...

result[ing] from the voluntary act of [the] plaintiff[s] which

gives the defendant notice of the changed circumstances which now

support federal jurisdiction."  See Addo v. Globe Life and Acc.

Ins. Co., 230 F.3d 759, 762 (5th Cir. 2000).  This is consistent

with the Fifth Circuit's rejection of a due diligence requirement:

"the defendant's subjective knowledge cannot convert a case into

a removable action."  Bosky, 288 F.3d at 210.

*B.*

This time,[16] the defendants predicate removal on the Rozel

Report produced by plaintiffs on April 30, 2018 in Plaquemines

---

[15] Just as correspondence or deposition transcripts (see Morgan v.
Huntington Ingalls, Inc., 879 F.3d 602 (5th Cir. 2018) constitute
"other paper" for the purposes of § 1446(b)(3), expert reports may
serve as "other paper" providing a basis to remove a lawsuit.  See,
e.g., Gibson v. Clean Harbors Envtl. Services, Inc., 840 F.3d 515,
522 (8th Cir. 2016).

[16] There is no credible dispute concerning whether this successive
removal is permissible.  This Court previously determined that the
claims stated by the plaintiffs' initial petitions were not
removable on the various grounds invoked by the defendants.  "As
a general rule, once a case is remanded to state court, a defendant
is precluded only from seeking a second removal *on the same
ground*."  S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 492-
93 (5th Cir. 1996)(emphasis in original).  This means that a
defendant may invoke the same jurisdictional predicate for removal
only if the pleading or event or new facts support that same
removal predicate.  Id. ("on the same ground" concerns not the
predicate for removal jurisdiction, but only "the pleading or even
that made the case removable.").  That the defendants (some of
them, for a second time in this same litigation) invoke federal

<u>Parish v. Rozel</u>.  This is the paper from which the defendants say they first ascertained that the case was removable under both the federal officer and the federal question statutes.[17]  The plaintiffs insist that the defendants could have first ascertained these removal predicates sooner and, thus, the procedural defect dispute focuses on whether the relevance of pre-SLCRMA and WWII-era conduct was apparent from the original petition or other papers pre-dating the <u>Rozel</u> Report such that removal based on the Report is untimely.[18]

---

question as one removal predicate does not now preclude removal for this reason alone; however, those decisions by other Sections of this Court in rejecting the federal question predicate for removal of this same or similar litigation helpfully inform the merits of the jurisdictional argument and shall be addressed.

[17] That the <u>Rozel</u> Report is "other paper" in the <u>Rozel</u> case is clear. But it also qualifies as "other paper" in the other wetlands cases such as this one.  The Louisiana DNR has adopted the <u>Rozel</u> Report as "consistent with the Louisiana State and Local Coastal Resources Management Act and practices of...the State of Louisiana[;]" accordingly, the defendants argue that the opinions in the report clarify that federal issues are directly implicated and that grounds for federal jurisdiction exist in all 42 similar cases, not just in <u>Rozel</u>.  The Court agrees only that the Report is "other paper" for the purposes of removing related litigation. Although different operational areas are at stake in different cases, the <u>Rozel</u> Report opinions elaborating on the plaintiffs' theories concerning what sort of conduct was "lawfully commenced" prior to SLCRMA's enactment applies on some level across the board to all wetlands litigation and is, thus, appropriately considered "other paper" that may serve as a basis to remove this related litigation. <u>See</u>, <u>e.g.</u>, <u>Halmekangas v. State Farm Fire & Cas. Co.</u>, No. 06-3942, 2007 WL 1125760, at *2-3 (E.D. La. April 16, 2007)(Barbier, J.)(citation omitted).

[18] Of course, the plaintiffs dispute the notion that its lawsuits present any removable claims.

Before the _Rozel_ Report, the defendants submit, no pleading or paper revealed the scope of pre-SLCRMA activities at issue in these lawsuits.  The defendants insist that the Report reveals for the first time that the plaintiffs' claims primarily attack activities undertaken before the State permitting law was effective; that is, a time when the challenged activities were subject to extensive and exclusive federal direction, control, and regulation.  The federal nature of the case, the defendants submit, was previously concealed by the plaintiff's disclaimers, whereas the Report identifies these "new" theories: that the defendants' federally directed wartime and other pre-1980 activities were carried out in "bad faith" and that defendants failed to follow prudent industry practices before SLCRMA's 1980 implementation.  These new theories, the defendants urge, opened a new removal window and, thus, removal is timely.

The plaintiffs counter that the defendants cannot credibly claim that the _Rozel_ Report first disclosed that the defendants' pre-SLCRMA and WWII-era activities are relevant to their permit enforcement lawsuits.  Even if the initial pleadings did not affirmatively disclose pre-SLCRMA relevant conduct, there are a litany of other events (well before the _Rozel_ Report was served) that did.  The plaintiffs urge that removal is too late because, for years, the defendants have been on notice that the plaintiffs' SLCRMA claims implicate pre-SLCRMA conduct, including from the

original and amended state court petitions; that the plaintiffs notified the defendants in other instances...requests for and responses to discovery and motion practice...that pre-SLCRMA conduct was implicated; and that the defendants' own arguments in prior proceedings and responses to discovery indicate that the defendants knew that the plaintiffs' claims distinctly and openly required inquiries into pre-SLCRMA conduct.

The Court finds that removal predicated on the _Rozel_ Report is simply too late. The Court need not (as urged by plaintiffs) consider whether the defendants subjectively knew that the plaintiffs' SLCRMA cause of action implicates pre-SLCRMA and WWII-era conduct. Although the defendants suggest that the _Rozel_ Report presents "new theories" of bad faith and changed impacts, these expert opinions simply put a finer point on what the plaintiffs already placed at issue: whether the defendants' activities in these operational areas were lawfully commenced prior to SLCRMA's enactment. If so, then come 1980, no permit was required; if not, then a coastal use permit was required once SLCRMA became effective. Although the _Rozel_ Report elaborates on the plaintiff's theory of how precisely the defendants' conduct in the coastal zone was not lawfully commenced, it does not present this theory or concept for the first time and therefore presents no changed circumstances supporting removal. Papers preceding the _Rozel_ Report disclosed that the plaintiffs' state permit enforcement

action calls for inquiries into conduct as far back as before and during World War II.

Examples of other paper that should have triggered the defendants' earlier awareness are resounding. The plaintiffs offer these filings: pre-SLCRMA activity is referenced in the plaintiffs' original petitions filed in 2013[19] (and each petition

---

[19] In the state court petition filed in November 2013, the plaintiffs allege that

- the defendants operated before the enactment of the SLCRMA, specifically "**[s]ince 1978 and before**, Defendants' oil and gas activities have resulted in dredging of numerous canals in, through, and across the Operational Area."

- "The use of waste pits in the Operational Area has a direct and significant impact on state coastal waters located within Plaquemines Parish, and thus each such pit required a coastal use permit after the enactment of the CZM Act of 1978. To the extent that, contrary to Plaintiffs' allegations, the use of any such waste pit was legally commenced **prior to** the enactment of the CZM Act of 1978, the continued existence of such waste pit following cessation of operations ...constituted a new use for which a coastal use permit was required.... Defendants never obtained the required state and/or local coastal use permits for the closure and/or post-CZM operations of their waste pits in the Operational Area. Additionally, these waste pits and areas adjacent thereto have never been cleared, revegetated, detoxified, and/or otherwise restored to their original condition as required by LAC 43:I.719.M. Furthermore, Defendants have failed to design and construct their waste pits located in the Operational Area using best practical techniques to prevent leaching and to prevent the movement of leachate away from their waste facilities, as required by LAC 43:I.715.D."

- "Plaintiffs allege that **most, if not all, of Defendants' operations or activities complained of herein were not 'lawfully commenced or established' prior to the implementation of the coastal zone management program**. See LAC 43:723(B)(8). **The complained-of operations and activities were prohibited prior to 1978** by various provisions of Louisiana Statewide Orders 29, 29-A, and 29-B, various field

included a map and list of oil and gas wells in the operational

areas); in amended petitions filed in 2017;[20] plaintiffs' first and

third set of discovery requests;[21] plaintiffs' response to

---

    wide orders, as well as various orders of the Louisiana Stream
    Control Commission."
[20] In the <u>Plaquemines v. Rozel</u> case, for example, which includes
removing defendant Chevron, the plaintiffs allege in an amended
petition:
    The canals dredged and used by Chevron,...in violation
    of the CZM laws have significantly contributed to the
    land loss that has occurred within the Operational
    Area[.]  Other contributors to the land loss which
    occurred within the Operational Area include surface
    subsidence inducted by production of vast quantities of
    fluids from the subsurface by each of the Defendants
    without using adequate countermeasures, such as fluid
    injection, to offset the resulting reduction of
    subsurface formation pressures, and the compounding
    effects of widespread, commingled contamination from
    Defendant's unpermitted releases and discharges of
    oilfield wastes into the interconnected tidal wetlands
    and waters of the Operational Area.
[21] On July 27, 2015, the plaintiffs requested that the defendants
"Admit that you conducted E&P Operations within the Operational
Area during the Relevant Period[,]" defined as "January 1, 1920 to
November 8, 2013."  The plaintiffs requested (for this same
"Relevant Period") that the defendants admit that induced fault
movement, surface subsidence, induced compaction, and land loss
occurred in the operational area and that defendants' activities
during the relevant period going back to 1920 caused this.  On
April 4, 2017, the plaintiffs requested for this same period
admissions concerning particular wells (including wells drilled
before SLCRMA) and admissions concerning defendants' dredging
activities at the operation of the well including whether a coastal
use permit was obtained, as well as whether a coastal use permit
was obtained to backfill or plug the canal and whether, at the
termination of operations, the defendants failed to restore the
E&P sites.  In Plaquemines and Jefferson Parish coastal land loss
cases, the plaintiffs note that Chevron responded to requests for
admission 369 days before re-removal, admitting that its
predecessor had obtained required permits for canal construction
within the Coastal Zone "from the appropriate agency over time,
including the U.S. War Department, the United States Army Corps of

Chevron's first set of discovery requests;[22] and on April 13, 2017,

in a memorandum in support of plaintiffs' motion to compel

production of pre-SLCRMA documents, the plaintiffs wrote:

> Defendants also repeatedly claim that Plaintiffs'
> discovery requests are improper because they seek
> information that pre-dates the effect of the SLCRMA.
> The regulations implementing the permitting requirements
> purport to exempt activities that were "lawfully
> commenced or established prior to the implementation of
> the coastal use permit process." Therefore, Plaintiffs
> contend that information related to pre-SLCRMA
> activities is relevant to determine what activities
> Defendants lawfully performed, and when.
> ...
> Plaintiffs contend that all of the information sought by
> the requests are discoverable – even the information
> related to pre-SLCRMA activities – because the
> information is relevant to determining which activities
> were and were not "lawfully commenced or established"
> prior to SLCRMA.

Finally, as plaintiffs' counsel observed during oral argument, in

at least some of the prior removed cases, the plaintiffs referenced

and attached the 1980 FEIS to prior motions to remand or replies

to defendants' oppositions to their motions to remand. See, e.g.,

Civil Action No. 13-7622, Rec.Doc. 60, page 8 and Exhibit A (filing

dated December 22, 2014). The FEIS is the document on which the

---

Engineers, or the Office of Coastal Management[.]" In Plaquemines
v. Rozel, in 2017 and early 2018, Chevron produced numerous
documents in discovery related to the activities in the operational
area that involved War Department permits and issues with the
Petroleum Administration for War dating back to the 1940s.
[22] In response to Chevron's and another defendant's discovery
requests "Admit that you are not basing Your action on any
activities by Chevron [or Atlantic Richfield] prior to enactment
of [SLCRMA]," on September 11, 2017, the plaintiffs responded:
"Plaintiff denies Request for Admission No. 1."

Rozel Report relies in spelling out the "bad faith" assessment of the "lawfully commenced" exemption.[23]

The plaintiffs have plainly and consistently indicated that the defendants' pre-SLCRMA conduct is relevant to their SLCRMA cause of action. The plaintiffs' allegations in their original petitions in 2013 place at issue activities specific to identified oil and gas wells and anchored to pre-SLCRMA time periods and expressly invoked the issues expounded upon by the Rozel Report. What the plaintiffs alleged -- "most, if not all, of Defendants' operations or activities complained of herein were not 'lawfully commenced or established' prior to the implementation of the coastal zone management program" -- has not changed in the Rozel Report. And plaintiffs' memorandum in support of their motion to compel responses to discovery in Rozel, in April 2017, again leans on the "lawfully commenced" exemption. It therefore cannot be said that the Rozel Report somehow revealed, for the first time, that the plaintiffs' claims implicated conduct predating the SLCRMA and WWII. Whether removal jurisdiction is predicated on the federal officer or federal question and general removal statutes, the Court cannot accept the defendants' characterization

---

[23] This reinforces the Court's finding that the Rozel Report simply elaborates on a theory of recovery that the plaintiffs have pursued for years in this litigation: the defendants' activities in the coastal zone since before WWII were not lawfully commenced and therefore required coastal permits once SLCRMA became effective.

that the relevance of their pre-SLCRMA and WWII-era conduct to the plaintiffs' SLCRMA cause of action only became evident when the Rozel Report was served on April 30, 2018. Even if the plaintiffs' disclaimers in the original petitions overcame their references to pre-SLCRMA conduct in those papers, well before the Rozel Report, the plaintiffs indicated that the defendants' conduct as far back as before the World War II era is relevant to determine whether the defendants' activities were lawfully commenced.[24]   The record

---

[24] In the asbestos exposure cases that dominate the federal officer removal litigation landscape, removal is often deemed timely upon a defendant's receipt of "other paper" revealing the identity of the U.S. Navy ship or Air Force aircraft that is allegedly the source of the plaintiff's asbestos exposure. Here, the defendants' theory of federal officer removal is anchored to the WWII time period.  Here, the state court petitions linked the defendants' alleged violations of SLCRMA to specific wells, contending that defendants' operations and activities that violated SLCRMA "were conducted or are being conducted to enable or support the drilling and operation of the oil and gas wells listed on [exhibit attached to petition.]"  During oral argument, plaintiffs' counsel observed that some of the wells at issue were drilled or operated during WWII such that identifying the wells at issue and providing the well serial numbers indicated that wartime activities were relevant to SLCRMA and its exceptions.  That the plaintiffs specifically allege that the defendants operated numerous wells in the operational areas, attached lists of wells operated by each defendant, and provided a map of the operational areas indicating the locations of these wells is not unlike the papers revealing the identity of the ship or aircraft that exposed a worker to asbestos and started the federal officer removal clock. From the start of this litigation, the plaintiffs have alleged that "most, if not all, of Defendants' operations or activities complained of herein were not 'lawfully commenced or established' prior to the implementation of" SLCRMA.   And, the plaintiffs consistently indicated during discovery that defendants' activities in the coastal zone as far back as 1920 would be challenged; thus, even extending § 1442's liberal interpretation to § 1446, the federal

23

is clear: from the beginning of this litigation, the plaintiffs expressly placed in dispute whether the defendants had "lawfully commenced" activities affecting coastal wetlands long before SLCRMA became effective. See Addo v. Globe Life and Acc. Ins. Co., 230 F.3d 759 (5th Cir. 2000)(stating rule that "'other paper' must result from the voluntary act of a plaintiff which gives the defendant notice of the changed circumstances which now support federal jurisdiction."). These other, earlier papers sufficiently triggered notice that pre-SLCRMA (including WWII-era) conduct is relevant to the plaintiffs' cause of action. At the latest, the 30-day removal period was triggered on April 13, 2017; thus, removal predicated on the April 30, 2018 Rozel Report is untimely.

If removal was timely,[25] the defendants invoke jurisdiction based on federal officer removal jurisdiction under 28 U.S.C. §

_____

officer removal ground was disclosed at the latest in the plaintiffs' discovery requests and responses.

[25] Where, as here, the defendants offer "other paper" to support removal, the timeliness issue is somewhat intertwined with determining whether the Court indeed has removal jurisdiction over this lawsuit. Or at least, the Court must assume that the "other paper" relied upon demonstrates the removal ground advanced for the purposes of determining timeliness. To be sure, the Court considered the content of the "other paper" and filings to determine whether the defendants could have first ascertained from the Rozel Report whether the plaintiffs had placed in dispute whether their actions were under color of federal office and connected to the plaintiff's claims, and whether the plaintiffs' state-law based coastal permitting cause of action is actually predominated by a necessarily raised, actually disputed, substantial federal issue capable of resolution in federal court without disrupting the federal-state balance. The support for defendants' federal question predicate is most glaringly absent

1442 and federal question jurisdiction under 28 U.S.C. § 1331.
And the Court now turns to those issues.

### III.
### Federal Officer Jurisdiction

*A.*

Title 28 U.S.C. § 1442, the federal officer removal statute, authorizes removal to federal court of an action "against or directed to ... [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office[.]" 28 U.S.C. § 1442(a)(1). Although not in the statutory text, the case literature requires that the removing "officer must also allege 'a colorable federal defense' to satisfy Article III's 'arising under' requirement for subject matter jurisdiction." State v. Kleinert, 855 F.3d 305, 311 (5th Cir. 2017)(citing Mesa v. California, 489 U.S. 121, 129 (1989)(explaining that § 1442 is an exception to the usual "well-pleaded complaint" rule)). The statute's primary purposes are to prevent hostile state courts from obstructing federal officers in the execution of their duties and to allow a federal court to determine the merits of immunity defenses. Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387,

---

given its arguments in the last round of removal, as addressed below.

397 (5th Cir. 1998)(citing <u>Willingham v. Morgan</u>, 395 U.S. 402, 406-07 (1969)). Given these purposes and the differences between § 1441 and § 1442, courts are commanded by Congress and the Supreme Court to interpret § 1442 generously in favor of removal when federal officers and their agents seek a federal forum. <u>See</u> <u>Arizona v. Manypenny</u>, 451 U.S. 232, 242 (1981); <u>see also</u> <u>Zeringue</u> <u>v. Crane Co.</u>, 846 F.3d 785, 789 (5th Cir. 2017)("[a]lthough the principle of limited federal court jurisdiction ordinarily compels [courts] to resolve any doubts about removal in favor of remand, ... courts have not applied that tiebreaker when it comes to the federal officer removal statute.")(citations omitted).

To remove under § 1442, the defendant must show that: (1) it is a "person" within the meaning of § 1442; (2) it "acted pursuant to a federal officer's directions and that a causal nexus exists between its actions under color of federal office and the plaintiff's claims[or charged conduct;]" and (3) it has asserted a "colorable federal defense." <u>See</u> <u>Winters</u>, 149 F.3d at 400; <u>Sawyer v. Foster Wheeler LLC</u>, 860 F.3d 249, 254 (4th Cir. 2017)(Or, in other words, the removing defendant must show that it is a person that "acted under a federal officer, that it has a colorable federal defense, and that the charged conduct was carried out for or in relation to the asserted official authority.")(internal citations, quotations omitted).

1. "Person"

The plaintiffs concede that the defendants are "persons" within the meaning of the statute. The other three elements are contested. Because the defendants fail to persuade the Court that the "acting under" and causal nexus elements are met, the Court does not reach whether the defendants have asserted colorable federal defenses in this case.

2. a) Acting Under?

To qualify as "acting under" a federal officer, private persons like defendants must make "an effort to assist, or to help carry out, the duties or tasks of the federal superior[,]" which must exert "subjection, guidance, or control" over the private company. Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 152 (2007). Merely being subject to federal regulation will not suffice to bring private action within the scope of the statute; rather, only private parties that are (often, contractually) obligated or "authorized to act with or for [federal officers or agents] in affirmatively executing duties under...federal law" are sufficiently "acting under" federal control. See id. at 151 (internal quotation and citation omitted). "When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court 'prejudice.'" Id. at 152. Simply complying with the law or regulations is insufficient to bring a private person within

the scope of the officer removal statute's arising under requirement. Id. Courts must look for evidence of *delegation* perhaps contained in a contract, payment, employer/employee relationship, or principal/agent arrangement. Id. at 156.

The paradigm "acting under" relationship is when a private person acts under the direction of a federal law enforcement officer. See id. at 149 (describing pre-Prohibition Era liquor tariff cases upholding federal officer removals by federal revenue officers or those assisting federal revenue officers in their official duties in raiding distilleries and arresting distillers). Thus, "[w]here a private person acts as an assistant to a federal official in helping that official to enforce federal law," the private person may satisfy the acting under requirement. Id. at 151 ("private persons who lawfully assist the federal officer in the performance of his official duty" may permissibly invoke the statute).

2. b) Causal Nexus

The causal nexus component of federal officer removal focuses on the connection between the actions taken under federal control and the plaintiffs' charged conduct; the element is not met when the challenged acts of the defendant are "free of federal interference." See Savoie v. Huntington Ingalls, Inc., 817 F.3d 457, 463 (5th Cir. 2016).

Asbestos exposure litigation pervades the federal officer removal case literature landscape and thus informs the causal nexus requirement. <u>See</u>, <u>e.g.</u>, <u>Melancon v. Lamorak Ins. Co.</u>, 742 Fed. Appx. 833, 834 (5th Cir. 2018). Courts have upheld federal officer removal when private companies remove cases involving claims for injuries arising from equipment manufactured for the government pursuant to government specifications. But it depends on the claims alleged. For example, when private firms use asbestos to manufacture or equipment for U.S. Navy ships or U.S. Air Force aircraft and are sued for strict liability by their employees whom have contracted mesothelioma, federal officer removal statute is warranted.

The contours of the causal nexus element in these cases have been defined by the cause of action, whether a plaintiff seeks to recover from a government contractor on the basis of strict liability or negligence. "For strict liability claims that 'rest on the mere use of asbestos,' a causal nexus is established because 'the government obligates the defendant to use the allegedly defective product that causes the plaintiff's harm.'" <u>Id.</u> But asbestos claims alleging "negligent failure to warn, train, or implement safety procedures do not give rise to federal jurisdiction when unrebutted evidence shows that the government did nothing to direct the shipyard's safety practices." <u>Templet</u>

v. Huntington Ingalls, Inc., 720 Fed. Appx. 726, 726-27 (5th Cir. 2018).

Courts including the Fifth Circuit have observed that the 2011 amendment to the federal officer removal statute ostensibly replaced the causal nexus test with a less restrictive test. Before 2011, the statute permitted removal by a federal officer who is sued "for any act under color of such office." Congress amended the statute in 2011 to permit removal by an officer in suits "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Notably, a panel of the Fifth Circuit acknowledged a dichotomy in its federal officer jurisdiction case literature since the federal officer statute was amended in 2011; Judge Jones writing for the panel majority criticized the viability of the "causal nexus" element the court has continued to endorse since 1442 was amended. See Latiolais v. Huntington Ingalls, Inc., 918 F.3d 406 (5th Cir. 2019). There, Judge Jones wrote that the 2011 amendment to Section 1442(a)(1) "broaden[ed] the basis for removal to federal court of claims brought against officers or agents of the federal government and those working under its direction[;]" but, the majority also acknowledged that the Fifth Circuit case literature, post-amendment, continued to apply the "causal nexus" test articulated for the prior iteration of the

statute.[26]  See id. (noting that the Fifth Circuit is "out of step

with Congress and our sister circuits, and noting other circuits

have read the 2011 amendments to eliminate the old "causal nexus

requirement.").[27]  Specifically, in Bartel v. Alcoa S.S. Co., Inc.,

805 F.3d 169, 172 (5th Cir. 2015), the Fifth Circuit panel quoted

the newly-amended statute, but adopted the same causal nexus test

that pre-dates the new statute; the same causal nexus test in which

"mere federal involvement does not satisfy the causal nexus

requirement; instead, the defendant must show that its actions

_____

[26] The amendment had no bearing on the analysis in Bartel.  Although
in Zeringue the court noted that the 2011 amendment broadened the
scope of the causal nexus requirement, the panel explicitly
reaffirmed Bartel.   Zeringue distinguished Bartel's negligence
claims from Zeringue's strict liability claims, the latter
justifying removal.    Later, the court directly addressed the
contention that Bartel had incorrectly applied pre-2011 precedent
to the post-amendment case. Legendre v. Huntington Ingalls, Inc.,
885 F.3d 398, 403 (5th Cir. 2018). Nevertheless, the court applied
the rule of orderliness, which precluded it from re-examining
Bartel. Id.

[27] Latiolais was a machinist aboard a U.S. Navy ship who was exposed
to asbestos while his ship underwent refurbishing; after he was
diagnosed with mesothelioma, he sued Avondale, the civilian
contractor that refurbished the Navy-owned ship. The contractor
removed the lawsuit to federal court, and the district court
granted the plaintiff's motion to remand.    The Fifth Circuit
affirmed the district court's holding that removal under the
federal officer removal statute was improper because the charged
conduct, the failure to warn regarding asbestos, was private
conduct that implicated no federal interests.    In so affirming,
however, the majority noted that "Avondale's failure to warn about
asbestos certainly 'relates to' its federal act of building the
ships [and a]pplying the post-2011 statutory language would change
the outcome of this appeal and would authorize the removal of many
more cases than the causal nexus test permits." Id. at 412.

taken pursuant to the government's direction or control caused the plaintiff's specific injuries." See Latiolais, 918 F.3d at 409 (quoting Savoie v. Huntington Ingalls, Inc., 817 F.3d 457, 462 (5th Cir. 2016)). Latiolais notes that, in Zeringue (a case decided after Bartel but before Legendre), the court "appeared to relax the causal nexus standard in light of the post-2011 'relating to' language, but reliance on that case is not appropriate." Id. at 410 (noting that Zeringue instructed that the causal nexus inquiry must be tailored to the facts of each case, and that Zeringue ruled only on the propriety of removing a strict liability claim under the statute and specifically declined to consider a negligence-based failure to warn claim, whereas, "[b]efore Zeringue, however, in a case brought against Avondale[, Savoie,] this court had decided that claims for negligent exposure to asbestos could not be removed pursuant to Bartel."). Judge Jones writes in Latioloais, "[t]he cases that post-date the 2011 amendment to the federal officer removal statute all continue to cite Bartel, while drawing a distinction for removal purposes between claims for negligence (not removable) and strict liability (removable) pursuant to the causal nexus test." Id. at 410. Concluding the opinion, Judge Jones notes that "Bartel should be reconsidered en banc in order to align our precedent with the statute's evolution." Id. at 412. In May 2019, the Fifth Circuit granted Huntington Ingalls' petition for rehearing *en banc;*

32

*Latiolais v. Huntington Ingalls, Inc.* will be reheard by the full court in September.

*B.*

The defendants anchor their federal officer removal predicate to the broad construction afforded § 1442 coupled with an historical narrative featuring the oil industry's critical role in the "war of oil" that was World War II. The oil operator defendants and their predecessors drilled wells, dredged canals, and laid flowlines under federal supervision. They produced oil using materials supplied by the federal government, at a pace directed by the federal government, for distribution and use by the federal government, and at prices set by the federal government; they could not prioritize 21st century environmental concerns.

In other words, the defendants paint a picture of an intrusively-regulated WWII-era, whereas the plaintiffs submit that federal involvement in wartime exploration and production activities was much more limited. The plaintiffs insist that the defendants cherry-pick government declarations to suggest that a high level of control was exercised over the industry, but, in reality, insofar as there was any control, it was limited to the "downstream" (refining) sector and not the "upstream" (exploration and production activity) sector that is relevant for the purposes of this litigation. The plaintiffs also point out that the defendants fail to allege any facts in the removal petition that

supports a finding of any federal officer's involvement in wartime E&P activities in the specific Operational Area defined in the state court petition.[28]   The defendants refer to but a single instance of federal oversight in the Potash Field (the subject of this case)[29] involving an application for an exception to Order M-68, which was required to obtain materials to drill 10 wells directionally and on less stringent spacing requirements than the 40-acre spacing required by Order M-68. Notably, the application was granted.   The defendants fail to highlight any "control" necessary to support federal officer removal; the defendants' factual predicate for federal officer removal falls short of demonstrating that the defendants or their predecessors were "acting under" a federal officer or that their conduct in doing so is sufficiently related to the charged conduct in this case.

---

[28] The plaintiffs insist that the defendants' reliance on 42 cookie-cutter removal notices resulted in the improvident removal of more than a third of the 42 coastal cases in which no oil and gas activities alleged in the complaint occurred before or during WWII. The plaintiffs point to Exhibit 37, which includes a list of coastal parish cases in which no defendant engaged in exploration and production activities prior to September 1, 1945, the date on which practically all of the Petroleum Administrator for War's oil and gas production regulation orders were revoked.  This includes Civil Action Numbers 18-5257, 18-5265, 18-5264, 18-5220, 18-5238, 18-5258, 18-5262, 18-5231, 18-5260, 18-5263, 18-5259, and 18-5222.
[29] Directed to the operational area at issue in this case, the defendants point to a 1942 letter from the Office of Petroleum Coordinator for War listing Potash Field as one of the fields "producing crudes of high value to the war program" and a 1945 document indicating that Potash Field among others "will have to be produced a rate greater [than originally determined] to meet war needs."

An understanding of the degree of federal regulation of the oil industry during WWII is critical to assessing the defendants' federal officer removal theory. Federal regulatory power and oversight was orchestrated to maximize oil production while conserving materials like steel. Manpower and materials were preferentially allocated toward the war effort. The Office of Petroleum Coordinator (which later became the Petroleum Administration for War) issued directives, which were followed "voluntarily" because OPC/PAW controlled the supply of critical materials like steel needed by oil field operators. Wartime exigencies forced strict control of every phase of the industry. By the end of the war, one-third of oil production was going directly to the military.

According to defense expert Alfred M. Gravel, federal oversight of the oil and gas industry went beyond regulatory and monitoring activities commonly associated with modern-day federal agencies. "Recommendations," which were later re-designated as "Directives" and "Orders" were issued by PAW to the oil industry to manage the allocation of materials for necessary operations and to maximize oil and gas production for the war. For example, Conservation Order M-68 restricted oil and gas production equipment and materials after December 23, 1941 and mandated that all new wells drilled must be spaced not more than one oil well to each 40 surface acres. The defendants offer this evidence:

The issuance of Conservation Order M-68 by the Office of Production Management clears the way for long-awaited relief to the petroleum industry in obtaining the materials it so urgently needs to carry on necessary operations, Petroleum Coordinator for National Defense Harold L. Ickes said today.... [T]oday's order provides that...material will be readily available for the drilling of new oil wells in all fields (other than condensate fields) where the particular wells conform to a uniform spacing pattern of not more than one single well to each 40 surface acres....

[M-68 was adopted] to obtain the adoption of well-spacing practices that will both increase the ultimate recovery of oil and minimize the use of critical defense materials, such as steel, non-ferrous metals and rubber. "It is imperative," the order reads, "that the production of petroleum be conducted under circumstances and conditions which will assure a maximum recovery of petroleum..., and which will not involve a waste and inefficient use of the limited quantities of critical materials available for petroleum production."

[M-68] provides that from now on "no operator shall order, purchase, accept delivery of, withdraw from inventory or in any other manner directly or indirectly, secure or use material for the production of petroleum" [and] "no person shall deliver or otherwise supply, or cause to be delivered or otherwise supplied, any material which he knows, or should know, is intended for use in the production of petroleum."

But the order allowed for exceptions:

...[I]ndividuals or fields desiring a well-spacing pattern other than that imposed by the Order, may file an application for such pattern.

The restrictions also do not apply in the following instances:
...
2.    To any case where material is sued by an operator exclusively for operations directly involved in the search for and discovery of a previously unknown pool. This includes material necessary for prospecting and material used in drilling and completing exploratory wells.
...

[With respect to the exceptions provided for in the Order,] Coordinator Ickes said:

"Ample provision has been made for individualized treatment which will permit individual operators and individual fields to secure materials assuring a drilling and construction program commensurate with the maximum recovery of petroleum located in existing reserves."

The exceptions, he said, are designed to "protect so far as is possible, the continued discovery and development of much-needed petroleum for the war effort."

M-68 was superseded by Petroleum Administrative Order-11; PAO-11 essentially continued M-68's requirements but simplified them and allowed some decisions about materials exceptions for oil production to be made at the PAW district level. According to Mr. Gravel, as wartime petroleum demands increased in mid-1943 through early 1944, the War Production Board made more materials available and the PAW relaxed some well spacing requirements for some oil fields to increase oil and gas production. Well-specific exceptions were permitted on a case by case basis. PAW supplemented PAO-11. In one supplemental order, unrestricted drilling of injection wells for secondary crude oil operations was permitted, but unrestricted drilling of injection wells for pressure maintenance or salt water disposal operations was prohibited. Another supplementary order singled out certain oil fields where wells must be vertically drilled and permitted less stringent spacing requirements. Potash was one of four Plaquemines Parish fields named in the supplemental order.

Mr. Gravel spends some time providing examples of "the impact of federal wartime control of materials on the oil and gas production activities in Plaquemines Parish." The examples are requests for exceptions from Order M-68 and PAO-11. He says "[t]he overriding federal requirement to maximize oil production while using a minimum of steel and other critical materials took precedence over any waste handling and disposal or environmental protection considerations." Mr. Gravel offers how PAW approved Humble Oil's request for exception under Order M-68 so that, in the Potash Field, it could use directional drilling and 10-acre spacing rather than 40. "This example," he says, "illustrates the limited circumstances under which PAW would authorize directional drilling to access oil needed for the war effort and the importance of access to a means of transport to convey the oil to refineries making war products."

Mr. Gravel identifies another request for exception from PAO-11 in which Gulf applied for materials necessary to drill and complete 10 wells in the Grand Bay Field; five would be at least 9,000 feet below the surface and would be drilled with spacing that could not comply with the 40-acre unit pattern. PAW granted Gulf's request. He offers still other exceptions made and suggests that these "demonstrate[] that federal wartime decisions on oil field development hinged on maximizing oil production with the minimum use of controlled materials." It is Mr. Gravel's "opinion

that during the WWII period, agencies of the federal government...exerted control over the exploration, development and production of crude oil, natural gas and related products in Plaquemines Parish, Louisiana." The upshot is that oil and gas companies sometimes did not have much choice during the war but often sought and were granted exceptions from certain wartime regulations. The plaintiffs point out that state conservation efforts were not placed on hold during the war.

*C.*

The Court has examined the voluminous record. Against the backdrop of WWII directives and federal oversight, it is clear that the oil industry was intensely regulated. Oil operators had to contend with limited materials, reach production quotas, and comply with war directives or be granted an exception. "But none of these documents establish the type of formal delegation that might authorize [the oil and gas companies] to remove the case." Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 156 (2007). The Court finds that the difference between wartime regulation and other types of administrative regulation is simply "one of degree, not kind." Id. at 157.

As to the "acting under" and causal nexus prerequisites to federal officer removal jurisdiction, the defendants submit that the plaintiffs challenge various activities, some of which were accomplished during wartime, as "not lawfully commenced." Insofar

as the federal officer removal statute is broadly construed in favor of a federal forum and authorizes removal of the entire case even if only one of the claims raised involves a federal officer or agency, the defendants submit that federal officer jurisdiction attaches here. Specifically, first, the defendants submit that the field at the center of the Rozel Report was first developed during World War II when the federal government directed the oil and gas industry to produce petroleum for military use and to conserve steel; "more than 5000 federal directives closely govern[ed] exploration, production, transportation, conservation, manpower usage, construction, drilling, spacing, disposal, and general operations."[30]  Second, the defendants contend that plaintiffs' allegations were undertaken "for or relating to" a federal officer or agency and, thus, the causal nexus is met.[31]

---

[30] The defendants contend that the plaintiffs' bad faith claims would directly contravene many federal orders and directives.

[31] In their notice of removal, the defendants include a charge in which they list various allegations by the plaintiffs compared to federal directives.  For example, the defendants note that the plaintiffs allege in the Rozel Report that the defendants failed to use steel tanks in the late 1930s and early 1940s and that tanks were safer and eliminated the need for leaking earthen pits like those used in the Bayou Gentilly case area.  But, the defendants counter with a letter from a senator during the war noting how critical it was to conserve steel, as well as an instruction from the Office of Petroleum Coordinator for National Defense, which instructed "the oil industry to perfect plans that will result in the conservation for defense purposes of much of the steel and other metal used in the manufacture of containers in which petroleum products are transported, stored, distributed and marketed."

Finally, the defendants contend that the have "multiple" colorable federal defenses,[32] including that (i) certain defendants are entitled to governmental immunity for conduct directed by the federal government under <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500 (1988);[33] (ii) federal law preempts the relief the plaintiffs seek in both the petitions and the Expert Report;[34] (iii) the defendants' activities prior to the enactment of the SLCRMA were carried out in compliance with applicable federal statutes, regulations, and orders and, therefore, the defendants cannot be held liable under SLCRMA for those "lawfully commenced" activities.[35] Insofar as the plaintiffs allege solidary liability, the defendants contend that this reinforces federal jurisdiction

---

[32] In their papers opposing remand, the defendants offer five "colorable federal defenses." Of the five "colorable federal defenses" the defendants now invoke the plaintiffs point out that two (due process and exhaustion) were not even pled in the removal notice.

[33] This defense applies where the United States approved reasonably precise specifications, the equipment conformed to the specifications, the supplier warned the United States about dangers in the use of the equipment that were known to the supplier but not to the United States.

[34] For example, the defendants submit that many courts have held that preemption is a colorable federal defense, and that the Clean Water Act prohibits "the discharge of any pollutant by any person" without a permit, and the Rivers and Harbors Act similarly prohibits the filling of tidelands or channels without a permit.

[35] This defense, they submit, will require interpretation of the federal law that applied to defendants' activities prior to SLCRMA's enactment, to assess defendants' compliance with federal law.

under the federal officer removal statute.[36]  In their papers
opposing remand, the defendants offer five "colorable federal
defenses."  Of the five "colorable federal defenses" the defendants
now invoke the plaintiffs point out that two (due process and
exhaustion) were not even pled in the removal notice.

The plaintiffs, correctly, in this Court's view, counter that
the Court lacks federal officer removal jurisdiction, that the
defendants offer nothing more than general wartime directives that
applied to the petroleum industry in its capacity as supplier of
petroleum to the economy as a whole.  The plaintiffs submit that
the defendants in this case bear no similarity to Crane Company in
Zeringue, which was required to supply valves containing asbestos
directly to the Navy;[37] or to Avondale Shipyard in Savoie, which
was directly bound by government contract to use asbestos in
constructing Navy and Coast Guard vessels;[38] or Diamond Shamrock

---

[36] The plaintiffs seek actual restoration of entire parish coastal
zones under a theory that the cumulative impacts of what defendants
insist were federally directed activities, including during a time
of war, which the plaintiffs allege rendered defendants' later
actions unlawful.

[37] Zeringue v. Crane Co., 846 F.3d 785, 792 (5th Cir. 2017)(finding
that the Navy exhibited a "significant degree of oversight" over
the defendant-manufacturer and holding that manufacturer was
"acting under" federal officer when it provided parts built in
accordance with military specifications in an effort to assist the
Navy's construction of vessels).

[38] Savoie v. Huntington Ingalls, Inc., 817 F.3d 457, 465-66 (5th
Cir. 2016)(holding that the plaintiffs' negligence claims
challenge discretionary acts of the shipyard free of federal
interference such that the negligence claims did not support
removal, but that the plaintiffs' strict liability claims

in Winters, which was compelled to manufacture Agent Orange to specific government standards and deliver it to the government under threat of criminal sanctions.[39] Here, instead, the defendants at most demonstrate extensive but mere oversight regulation, which the Supreme Court in Watson held cannot support "acting under" the direction of a federal officer.[40] Simply complying with federal law is insufficient, the Supreme Court wrote:

> The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the private firm's activities are highly supervised and monitored. A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.

---

supported federal officer removal because the government obligated the defendant to use asbestos in constructing the Navy and Coast Guard vessels, thereby satisfying the causal nexus requirement, but remanding to the district court to consider whether either proffered federal defense was colorable).

[39] Winters v. Diamond Shamrock Chemical Co., 149 F.3d 387, 399-400 (5th Cir. 1998)(holding that the government maintained strict control over the development, production, and composition of Agent Orange satisfying the causal nexus between the federal officer's direction and the plaintiff's claim that exposure to Agent Orange had caused her lymphoma).

[40] Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 152-53 (2007)(holding that cigarette manufacturer did not fall within the terms of the federal officer removal statute in its testing and advertising of tar and nicotine levels in cigarettes and, thus, claim brought by consumers was not removable to federal court).

Watson, 551 U.S. at 152.  This Court, respectful of its time-honored limited jurisdiction, allies itself with Watson.

Even if the defendants could demonstrate that all WWII-era oil production conduct was accomplished under a federal officer, the plaintiffs contend that the defendants' federal officer removal ground falters for failure to establish the requisite "causal nexus" between the defendants' activities during the war and the charged conduct.  The Court agrees.

Not only is the scope of the causal nexus requirement as interpreted by the Fifth Circuit post-2011 amendment fraught with uncertainty, but the parties dispute precisely what is the "charged conduct."  Plaintiffs argue that the "charged conduct" relating to federal officer removal occurred in 1980 when SLCRMA went into effect and defendants failed to obtain permits for prior activities that were not lawfully commenced.[41]  The defendants counter that the Rozel Report attacks defendants' pre-1980 operations, not just defendants' failure to obtain a permit.

---

[41] The plaintiffs admittedly do not pursue (nor would it seem could they pursue) a claim to recover simply on a theory that the defendants' pre-1980 activities were in bad faith; rather, the plaintiffs allege that defendants violated SLCRMA by failing to obtain coastal use permits to restore unlawfully commenced activities.  "[C]ertain pits and salt discharges occurring prior to 1980 were not legally commenced in good faith and therefore required a separate coastal use permit in order to continue operation post-1980."

The plaintiffs' characterization of the charged conduct is reinforced by an understanding of the scope of both SLCRMA and the plaintiffs' Rozel Report on violations. As a matter of law, the plaintiffs can only recover under SLCRMA when a use was made without a necessary coastal use permit or where a use was made in violation of the terms of a coastal use permit.[42] So limited, the Rozel Report purports to identify violations providing the basis for the defendants' liability in the Bayou Gentilly case. First, in examining violations for undertaking coastal uses without a coastal use permit, the report opines that pre-SLCRMA activities legally commenced were exempt under the statute and did not require a coastal use permit, unless the impacts of the activities commenced prior to 1980 changed after 1980 and the change in impact negated the initial exempt status. Examples include continued operations of canals without seeking a permit for modification and continued discharge of produced water. Second, the report's authors opine that certain uses commenced before 1980 are not exempt from SLCRMA (because the activities were not legally commenced or commenced in good faith) and a coastal use permit was therefore required once SLCRMA became effective in 1980. "At the

---

[42] According to the Rozel Report, the plaintiffs seek to enforce SLCRMA by prosecuting both types of SLCRMA violations: that a use was made without a necessary coastal use permit and that a use was made in violation of the terms and conditions of a coastal use permit.

least, certain pits and salt discharges occurring prior to 1980 were not legally commenced or commenced in good faith and therefore required a separate coastal use permit in order to continue operation post 1980." Use of earthen pits is identified as an example of a pre-1980 activity that was in bad faith and therefore could not have been lawfully commenced when SLCRMA commenced in 1980; defendants engaging in such conduct violated SLCRMA, failed to restore the properties, and failed to get a coastal use permit to do so come 1980.

Third, the Rozel experts opine that certain non-exempt coastal uses initiated after 1980 required either a coastal use permit or a determination of a no direct and significant impact (NDSI) on the coast. Examples include maintenance dredging and plugging and abandoning wells. Fourth, the plaintiffs' expert opines that defendants violated SLCRMA by failing to fully disclose cumulative impacts in applications for coastal use permits seeking to dredge or maintain canals. Finally, the plaintiffs' expert opines that, in some instances, defendants violated the terms and conditions of the coastal use permit issued.[43]

Here, the defendants submit that the second Rozel opinion directly challenges WWII conduct and that the defendants could not

_____

[43] The Rozel Report concludes by identifying "Alternative Practices," which were available to the defendants and might have substantially mitigated impacts after 1980.

have acted in bad faith during a time when oil production was so heavily regulated by the PAW. But the plaintiffs charge that the SLCRMA violation set forth in the second opinion is that the defendants failed **in 1980** to obtain a coastal use permit for illegally commenced conduct predating SLCRMA; at that time, the defendants' conduct in failing to obtain a coastal use permit was free of federal interference and fails the causal nexus test. Thus, they insist that the charged conduct is limited to post-1980 "uses."

The causal nexus element asks whether it was essentially the federal government, and not the defendant, that caused the plaintiffs' injuries. As it must in the federal officer removal arena, the Court indulges defendants that their wartime activities are implicated in the charged conduct rather than their mere failure to obtain coastal use permits in 1980. Based on the wartime regulations and directives, the defendants submit that they or their predecessors vertically drilled wells, spaced wells, used earthen pits, discharged produced water, and dredged canals under color of federal office. That the government had the power to exercise control over these aspects of oil production during the war, however, does not establish that the power was actually exercised. In other words, how the directives were carried out is of consequence; the record shows that the PAW regulated the industry and issued mandatory directives. And the oil operators

generally complied with the directives.  But, like all regulatory bodies, there were detailed exceptions to the directives and operators could likewise seek relief from the regulatory directives.  Exceptions such as the one of record in this case in the Potash field.  "[P]rivate [individualized] conduct implicates no federal interest."  Melancon, 742 Fed. Appx. at 835 (citation omitted).

The Court thus finds federal officer removal jurisdiction lacking.  That the defendants may have complied with some federal oversight directives during WWII is precedentially insufficient to confer federal officer removal jurisdiction.  The private oil and gas industry's wartime compliance with federal laws or regulations falls short of being within the scope of "acting under" a federal official for acts "under color" of such office.[44]

IV.

Federal Question Jurisdiction

*A.*

Congress vests this Court with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Cases "arise under" federal

---

[44] The defendants point to no mandate that the federal government ordered the oil and gas companies to drill and produce these operational areas that would otherwise not have been developed but for the wartime directives.  The defendants stop short of this, even though it is undisputed that many operational areas were developed/produced before the SLCRMA was enacted in 1980.

law only in one of two ways, if the well-pleaded complaint establishes either that: (1) "federal law creates the cause of action[;]" or (2) "the plaintiff's right to relief [under state law] necessarily depends on resolution of a substantial question of federal law." Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677, 689-90 (2006)(internal quotation marks omitted)(citing Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 27-28 (1983)). Thus, critically, the federal question jurisdiction determination is anchored to the well-pleaded complaint rule, which applies to the Court's original and removal jurisdiction and restricts a defendant's ability to remove a case from state court. See Franchise Tax Board, 463 U.S. at 9-10 and n.9 ("[A]s a practical matter[, the rule] severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court, thereby avoiding more-or-less automatically a number of potentially serious federal-state conflicts."); Rodriguez v. Pacificare of Texas, Inc., 980 F.2d 1014, 1017 (5th Cir. 1993)("Removal is not possible unless the plaintiff's 'well pleaded complaint' raises issues of federal law sufficient to support federal question jurisdiction.").[45]

---

[45] "Regardless of which form the federal question takes, every complaint is subject to a basic gatekeeping principle: the well-pleaded complaint rule." Plains Capital Bank v. Rogers, 715 Fed.

The well pleaded complaint rule provides that "federal question jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." Caterpillar Inc. v. Williams, 482 U.S. 386, 393 (1987)(citations omitted); Gully v. First Nat. Bank in Meridian, 299 U.S. 109, 112 (1936)("To bring a case within the [federal question removal] statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action."). Of course, neither a defense nor a counterclaim is part of the plaintiff's statement of its claim. Thus, the well pleaded complaint rule plainly obliges the Court to look only to "what necessarily appears in the plaintiff's statement of his own claim ... unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." Taylor v. Anderson, 234 U.S. 74, 75-76 (1914); Vaden v. Discover Bank, 556 U.S. 49, 60 (2009)("Under the longstanding well-pleaded complaint rule...a suit 'arises under' federal law 'only when the plaintiff's statement of his own cause of action shows that it is

---

Appx. 325, 328 (5th Cir. 2017)(citing Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677, 689-90 (2006)).

based upon [federal law].”). It follows that "a case may not be removed to federal court on the basis of a federal defense, ... even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case." Franchise Tax Board, 463 U.S. 1, 14 (1983).

The artful pleading doctrine is a corollary to the well pleaded complaint rule: "a plaintiff may not defeat removal by omitting to plead necessary federal questions." Id. at 22. "If a court concludes that a plaintiff has 'artfully pleaded' claims[,] it may uphold removal even though no federal question appears on the face of the plaintiff's complaint." See Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 475 (1998)(citations omitted)("The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim."); see also Franchise Tax Bd., 463 U.S. at 24 ("if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law.").[46]

---

[46] "Although federal preemption is ordinarily a defense, '[o]nce an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state-law claim is considered, from its inception, a federal claim, and therefore arises under federal law.'" Rivet, 522 U.S. at 475 (citation omitted).

Most typically, cases arise under federal law when federal law creates the plaintiff's cause of action.  However, a "slim category" of state law claims give rise to federal question jurisdiction.  See Gunn v. Minton, 568 U.S. 251, 257-58 (2013). The Supreme Court has fashioned a four-part test to determine whether a state law claim falls within this tiny category of cases; federal question jurisdiction lies over a state law claim, only if a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress. Gunn v. Minton, 568 U.S. 251, 258 (2013)(translating into a four-part test the question framed by Grable); Grable & Sons Mental Products, Inc. v. Darue Engineering & Manufacturing, 545 U.S. 308, 314 (2005)(framing "the question [as] does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.").[47]  Again, only a "special and

---

[47] The Fifth Circuit has cautioned:
> The fact that a substantial federal question is necessary to the resolution of a state-law claim is not sufficient to permit federal jurisdiction: Franchise Tax Board ... did not purport to disturb the long-settled understanding that the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction.  Likewise, the presence of a disputed federal issue is never necessarily dispositive.  Instead, far from creating some kind of

small category" of cases that fit all four criteria.  See Gunn, 568
U.S. at 258 (citing Empire Healthchoice Assurance, Inc. v. McVeigh,
547 U.S. 677, 699 (2006)).[48]  This is not one of them.

*B.*

To be sure, the defendants fail to show that a federal
question exists on the face of the plaintiffs' state court petition
"unaided by anything alleged in anticipation or avoidance of
defenses which it is thought the defendant may interpose."  Taylor,
234 U.S. at 75-76.  Indeed, it would seem the defendants' very
invocation of federal question as a predicate for removal is self-
defeating, considering that it now removes under the "other paper"
provision of the removal statute because, defendants argue, the
initial state court petitions in these cases did not reveal
(indeed, disclaimed) the existence of a federal question.[49]
Nevertheless, the defendants urge that the unprecedented breadth
of the allegations in the Rozel Report and the need to interpret

_____

automatic test, Franchise Tax Board thus candidly
recognized the need for careful judgments about the
exercise of federal juridical power in an area of
uncertain jurisdiction.

Singh v. Duane Morris, LLP, 538 F.3d 334, 337-38 (5th Cir. 2009).

[48] "In cases lacking a federal cause of action, the Supreme Court
has clearly upheld jurisdiction under § 1331 in only four
instances.... Even in the lower courts, rather few decisions uphold
jurisdiction in such cases."  Plains Capital Bank v. Rogers, 715
Fed.Appx. 325, 328 (5th Cir. 2017)(quoting Richard H. Fallon, Jr.
et al., Hart and Wechsler's The Federal Courts and the Federal
System 836 (7th ed. 2015)).

[49] Including bad faith conduct pre-1980.

federal law in order to prove the alleged violations establish that the elements of arising under jurisdiction are met for the special and small category of cases like these.

Plaintiffs have carefully restricted their claim to state law. Defendants have not shown that federal jurisdiction exists on the face of the petition; defendants have failed to show that federal law completely preempts plaintiffs' claims. Nor do plaintiffs' claims raise a federal issue sufficient to create federal jurisdiction in this case because they are neither necessary or substantial within the meaning of § 1331. "Ultimately, whether a federal issue embedded in the matrix of a state law claim will support federal question jurisdiction entails a pragmatic assessment of the nature of the federal interest at stake." Riehm v. Wood Resources, No. 16-12474, 2016 WL 6123372, at *4 (E.D. La. Oct. 20, 2016)(quoting Howery v. Allstate Ins. Co., 243 F.3d 912, 917 (5th Cir. 2001)). Not every state cause of action that might implicate an issue of federal law belongs in federal court.

"As an initial proposition, ... the 'law that creates the cause of action' is state law, and...federal jurisdiction is unavailable unless...some substantial, disputed question of federal law is a necessary element of the well-pleaded state claims, or that one... claim is 'really' one of federal law." Franchise Tax Board, 463 U.S. at 13. In urging that federal

question removal jurisdiction lies over this case, the defendants invoke the exceedingly narrow jurisdictional ground, contending that the plaintiffs' SLCRMA claim arises under federal law because federal law is a necessary element of the plaintiffs' claim for relief. Although the defendants submit that the plaintiffs' right to relief necessarily depends on resolution of a substantial question of federal law, they fail to define the substantial and disputed issue of federal law. The plaintiffs counter that the defendants' <u>Grable</u> argument based on SLCRMA's historical use exemption at La.R.S. 49:214.34(C)(2) is, at most, an argument that the defendants have a federal defense[50] and, the plaintiffs insist, the defendants' arguments wholly ignore the well pleaded complaint rule.

The defendants present two principal and related arguments in support of federal question jurisdiction. First, the defendants contend that the plaintiffs' retroactive liability theories raise necessary federal questions that are substantial and disputed and exercising jurisdiction will not upset the federal-state balance. Second, the defendants invoke the <u>Levee Board</u> case. The

---

[50] Defenses to the plaintiffs' claims do not confer subject matter jurisdiction under the well-pleaded complaint rule. <u>Venable v. Louisiana Workers' Comp. Corp.</u>, 740 F.3d 937, 942-43 (5th Cir. 2013)(finding that the federal issue identified by the district court anticipates the defendant's prospective defense and that none of the plaintiffs' claims requires proving a federal issue as an element of the claim).

defendants' arguments are equally unpersuasive. That the defendants seem to have difficulty in pinpointing or defining the federal law supposedly necessarily and disputed raised is telling. And that other Sections of this Court have previously remarked on this same deficiency in similar litigation amplifies that this is not one of the special and small category of cases in which a state law claim arises under federal law.

1. <u>Grable</u>

The defendants first invoke <u>Grable</u>. There, the Supreme Court authorized the exercise of federal question jurisdiction over a state law quiet title action. The dispute in <u>Grable</u> centered on a nearly pure issue of law -- it concerned the action of a federal agency and its compatibility with a federal statute, the question qualified as "substantial," and its resolution was both dispositive of the case and would controlling in numerous other cases. Not so, here. The plaintiffs' State permitting cause of action triggered by private oil industry exploration and production activity on the Louisiana coast. The Parish and State plaintiffs' claims are fact-bound and specific to different operational areas. The defendants identify no pervasively federal character to this dispute. And no party has identified a significant conflict between an identifiable federal policy or issue and the operation of state law.

The defendants suggest that, to establish "bad faith" practices pre-dating SLCRMA, the plaintiffs must demonstrate violations of duties governed exclusively by pre-1980 federal permits and regulations and that to establish "changed impacts," the plaintiffs must demonstrate that coastal impacts exceed impacts authorized by pre-1980 federal permits and regulations. But the plaintiffs insist that the defendants fail to identify what federal law or regulation must be interpreted and ignore applicable state law. The defendants gloss over entirely fact-bound determinations and instead focus on the implausibility of the plaintiffs' cause of action, rather than identifying substantial and disputed issues of federal law. But "it takes more than a federal element to open the 'arising under' door [and t]his case cannot be squeezed into the slim category <u>Grable</u> exemplifies." <u>McVeigh</u>, 547 U.S. at 701.

The Court is not persuaded that the defendants have identified a federal issue or that this federal issue satisfies all four criteria necessary to support the exercise of federal jurisdiction over a state law claim.

2. <u>Levee Board</u>

The defendants invoke a case decided by now-Chief Judge Brown and affirmed by the Fifth Circuit, <u>Board of Comm'rs of the Se.</u> <u>Louisiana Flood Prot. Auth-E. v. Tennessee Gas Pipeline Co., LLC</u>, 29 F. Supp. 3d 808, 862-63 (E.D. La. 2014), <u>aff'd</u>, <u>Board of Comm'rs</u>

of the *Se. Louisiana Flood Prot. Auth-E. v. Tennessee Gas Pipeline Co., LLC*, 850 F.3d 714, 723-24 (5th Cir. 2017), *cert. denied sub nom.,* 138 S. Ct. 420 (2017). Chief Judge Brown, the defendants insist, found federal jurisdiction over state law tort claims for the similar activities at issue here.

The Board of Commissioners of the Southeast Louisiana Flood Protection Authority-East sued companies involved in oil exploration and production activities off the southern coast, alleging that the defendants' activities caused infrastructural and ecological damage to coastal lands overseen by the Board that increased the risk of flooding due to storm surges and required costly flood protection measures. Id. The Board asserted causes of action for negligence, strict liability, natural servitude of drain, nuisance, and breach of contract as to third-party beneficiaries. The Board sued in state court; the defendants removed, invoking the court's arising under jurisdiction. Notably, the Board's complaint described "a longstanding and extensive regulatory framework under both federal and state law" that protects against the effects of dredging activities and establishes the legal duties by which Defendants purportedly are bound. Id. Although none of the individual causes of action relied on federal law and the negligence, strict liability, and natural servitude claims relied on state law, the complaint identified federal and state regulatory sources bearing on oil and gas

activities, including the Rivers and Harbors Act, the Clean Water
Act, and the Coastal Zone management Act.

And, thus, the plaintiff itself in Levee Board specifically
invoked an extensive regulatory framework under both federal and
state law aimed at protecting against the effects of dredging
activities; according to the plaintiff, the relevant components of
the regulatory framework buttressed the plaintiff's claims.  Judge
Brown determined that three of the Board's claims necessarily
raised federal issues: the negligence claim, which drew its
requisite standard of care from three federal statutes; the
nuisance claims, which rely on the same standard of care; and the
third-party breach of contract claim, which was based on permits
issued pursuant to federal law.

In affirming the district court's finding of subject matter
jurisdiction and its dismissal on the merits, the Fifth Circuit
observed that the federally-authorized dredging, exploration and
production activities at issue in the Levee Board case raised
important federal questions:

> The absence of any state law grounding for the duty that
> the Board would need to establish for the Defendants to
> be liable means that that duty would have to be drawn
> from federal law.  Supreme Court precedent is clear that
> a case arises under federal law where "the vindication
> of a right under state law necessarily turn[s] on some
> construction of federal law" ....[T]he validity of the
> Board's claims would require that conduct subject to an
> extensive federal permitting scheme is in fact subject
> to implicit restraints that are created by state law.
> The implications for the federal regulatory scheme of

the sort of holding that the Board seeks would be significant, and thus the issues are substantial.

Board of Comm'rs of the Se. Louisiana Flood Prot. Auth-E. v. Tennessee Gas Pipeline Co., LLC, 850 F.3d 714, 723-24 (5th Cir. 2017), *cert. denied sub nom.,* 138 S. Ct. 420 (2017).

But this decision does not dictate the same result here. The defendants' argument that the only duties imposed on them pre-SLCRMA "must be" defined by federal law is at best an argument based on defensive preemption. The plaintiffs carefully and correctly distinguish the Levee Board case, arguing that the plaintiffs in that case alleged specific violations of federal laws and duties, whereas the plaintiffs here do not allege any federal violations. The plaintiffs here insist that their claims are limited to the SLCRMA, that the parallel federal permitting schemes are not disputed or at issue, and, insofar as the defendants' Grable jurisdictional argument is based entirely on the historical use exemption in La.R.S. 49:214.34(C)(2), the historical use exemption is merely an affirmative defense that falls short of support for federal question removal. The plaintiffs insist that the defendants fail to identify even one disputed interpretation of federal law or regulation. The plaintiffs add that, under the historical use exemption, a defendant may be deemed imprudent or in bad faith as a result of acts or omission that were contrary to the public trust doctrine,

Louisiana property law, or industry best practices, regardless of whether it complied with the permits issued under the Rivers and Harbors Act or the Clean Water Act; thus, insofar as the defendants argue that their compliance with these federal permits excused their violation of state law, their argument amounts to an assertion of conflict preemption, which does not support removal.

The plaintiff in <u>Levee Board</u> explicitly invoked the three federal laws (Rivers and Harbors Act, Clean Water Act, and the Coastal Zone Management act), alleging that those laws provided the duty the defendants owed to the plaintiff; and that plaintiff never pointed to any specific Louisiana statutes or regulations. Unlike <u>Levee Board</u>, where federal statutes and regulations were not merely one of multiple theories that could support the plaintiff's negligence and nuisance claim, the plaintiffs specifically allege that the defendants breached duties imposed under Louisiana law. Because the plaintiffs have not explicitly relied on federal law in their petition and because a duty under Louisiana law has not been foreclosed by controlling jurisprudence, <u>Levee Board</u> is not controlling.

All cases to consider whether these coastal wetlands or "oil patch" cases fit within the scope of this extraordinarily limited category of cases have determined that they fall outside its scope. For example, Judge Africk considered and rejected defendants' invocation of federal question jurisdiction in a similar coastal

zone case. <u>Dinvaut v. Cambridge Energy Corp.</u>, No. 17-5630, 2017

WL 3484759 (E.D. La. Aug. 15, 2017)(Africk, J.).  There, Judge

Africk found that the defendants' reliance on the plaintiffs'

allegations concerning defendants' pre-SLCRMA activities did not

support arising under jurisdiction:

> Actions taken before the Act went into force are relevant
> to whether a particular use is grandfathered into the
> Act's regulatory scheme. See La. R.S. 49:214.34(C)(2)
> ("Individual specific uses legally commenced or
> established prior to the effective date of the coastal
> use permit program shall not require a coastal use
> permit.").  So the mere fact that the petition discusses
> events prior to the Act's effective date does not
> establish that the state court will need to consider any
> question of federal law when determining defendants'
> potential liability under the Act.  Instead, all it
> establishes is that Dinvaut intends to show that
> defendants' activities before the Act did not comply
> with various Louisiana laws and regulations concerning
> oil exploration in effect before the Act came into force,
> and therefore such activities cannot be grandfathered in
> under the Act.

<u>Id.</u> at *4.  Several other courts have reached this same conclusion.

And, critically, in some of these cases either the parties

conceded, or the Court decided that <u>Levee Board</u> was inapposite.[51]

---

[51] <u>See</u>, <u>e.g.</u>, <u>Cameron v. Auster Oil & Gas</u>, No. 16-530, 2018 WL
2144281 (W.D. La. May 9, 2018)(following Judge Africk's reasoning
in <u>Rozel</u>). "As Judge Africk noted in <u>Rozel</u>, <u>SLFPA I</u> involved state
law tort claims in which the plaintiff agency had "based the
standard of care on federal law, which would require the court to
decide 'what duties these laws impose on Defendants.'" <u>Id.</u> <u>See</u>,
<u>also</u>, <u>e.g.</u>, <u>Stutes v. Gulfport Energy Corp.</u>, No. 16-1253, 2017 WL
4286846 (W.D. La. June 30, 2017), report and recommendation adopted
in full, 2017 WL 4274353 (W.D. La. Sept. 26, 2017); <u>Dinvaut v.
Cambridge Energy Corp.</u>, No. 17-5630, 2017 WL 3484759 (E.D. La.
Aug. 15, 2017)(Africk, J.); <u>St. Bernard Parish v. Atlantic</u>

The defendants fail to persuade the Court to part ways with these prior rulings. Although the defendants suggest that the <u>Rozel</u> Report laid bare the federal dimension to these cases, the defendants' arguments and articulation of the federal issues supposedly disputed and necessary has not changed. The defendants continue to fail to articulate a specific federal issue such as those present in the plaintiffs' case in <u>Levee Board</u>. The scope of the second type of arising under jurisdiction is simply not as generous as the defendants hope.

* * *

Accordingly, IT IS ORDERED: that the motions to remand are hereby GRANTED.[52] The defendants have suggested that they shall immediately appeal any remand order as they are entitled to do under 28 U.S.C. § 1447(d) as it pertains to their federal officer

---

<u>Richfield Co.</u>, No. 16-16294, 2017 WL 2875723 (E.D. La. July 6, 2017)(Barbier, J.); <u>Riehm v. Wood Resources, LLC</u>, No. 16-12747, 2016 WL 6123372 (E.D. La. Oct. 20, 2016)(Barbier, J.); <u>Bernstein v. At. Richfield Co.</u>, No. 15-630, 2015 WL 3454740 (E.D. La. May 29, 2015)(Barbier, J.); <u>Plaquemines Parish v. Hilcorp Energy Co.</u>, No. 13-6727, 2015 WL 195460, at *4-5 (E.D. La. Apr. 29, 2015)(Feldman, J.); <u>Plaquemines Parish v. Rozel Operating Co</u>., No. 13-6722, 2015 WL 403791, at *4-5 (E.D. La. Jan. 29, 2015)(Africk, J.)(noting that defendants offered "only a nebulous characterization of the questions of federal law ... implicated by the Parish's lawsuit: questions concerning the scope of the [Corps'] authority to assert ultimate control over the operations in the Coastal Zone and whether that authority is exclusive, as well as questions concerning the effect of federal law on the permitted scope and authority of the state standards.").

[52] Although the defendants reassert their prior grounds for removal, those issues have been previously addressed and are now moot.

removal predicate, and they therefore request that the Court certify for interlocutory appeal their asserted federal question predicate for removal. The request is GRANTED. Under 28 U.S.C. § 1292(b), the Court finds that its Order and Reasons addresses controlling issues of law as to which there might be substantial ground for difference of opinion. So certified, the Fifth Circuit might in its discretion permit an appeal of all issues contained in this Order and Reasons.

New Orleans, Louisiana, May 28, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE