UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

THE PARISH OF PLAQUEMINES                           CIVIL ACTION

v.                                                  NO. 18-5217

RIVERWOOD PRODUCTION CO., et al.                    SECTION F

<u>ORDER AND REASONS</u>

Before the Court is a renewed motion to remand by the plaintiffs and plaintiff-intervenors.   For the reasons that follow, the motion is GRANTED.

**Background**

This case is one of many seeking to determine the oil and gas industry's responsibility (and consequent restoration obligations) for the rapid loss/deterioration of Louisiana's coastal wetlands. For a third time, this Court must determine whether these cases belong in federal court.

Louisiana costal parishes[1] filed this and 41 other lawsuits in state court against 212 oil and gas companies alleging that dredging, drilling, and waste disposal caused coastal land loss

---

[1] The parish plaintiffs include Plaquemines, Jefferson, Cameron, Vermillion, St. Bernard, and St. John the Baptist.   Each parish filed suit on its own behalf and in most if not all cases, the State of Louisiana through the Attorney General and through the Department of Natural Resources intervened as plaintiffs to protect the State's interests.

1

and pollution; the plaintiffs allege a singular statutory cause of action for violation of Louisiana's State and Local Coastal Resources Management Act of 1978 (the CZM Act or the SLCRMA). Louisiana Revised Statute § 49:214.36(D) provides a cause of action against defendants that violate a state-issued coastal use permit or fail to obtain a required coastal use permit.[2]  Among the exemptions from coastal use permitting requirements are uses which do not have a significant impact on coastal waters (La.R.S. § 49:214.34(A)(10)) and activities "lawfully commenced" prior to the SLCRMA's enactment (La.R.S. § 49:214.34(C)(2) ("Individual specific uses legally commenced or established prior to the effective date of the coastal use permit program shall not require a coastal use permit.").

It is the public policy of the State of Louisiana "[t]o protect, develop, and where feasible, restore or enhance the resources of the state's coastal zone." La.R.S. § 49:214.22(1). The SLCRMA regulates certain "uses" (activities that have substantial impacts on coastal waters) within the coastal zone and authorizes local governments with approved programs to enforce the

---

[2] Paragraph D of La.R.S. § 49:214.36 authorizes local governments to seek injunctive or declaratory relief to ensure permitted uses; paragraph E states that "[a] court may impose civil liability and assess damages; order...restoration costs; require...actual restoration[;] or otherwise impose reasonable and proper sanctions for [unauthorized] uses[; t]he court in its discretion may award costs and reasonable attorney's fees to the prevailing party."

Act to ensure that the only uses made of the coastal zone are those authorized by a permit.  The defendants' oil and gas exploration, production, and transportation activities in the coastal parishes, it is alleged, have contributed to coastal land loss, pollution, and other damage.[3]  Each lawsuit involves oil and gas operations conducted in a different Operational Area and is brought against a different cast of defendants.[4]  The plaintiffs seek recovery of

---

[3] The plaintiffs allege that the defendants' activities have violated implementing regulations, including those that require restoration of production sites upon termination of operations and require construction/operation of drilling sites using techniques to prevent the release of pollutants, as well as those that prohibit disposal of radioactive waste in the coastal zone. Specifically, it is alleged that the defendants' construction, use, and failure to close unlined earthen waste pits violate the CZM Act and regulations; that, if any waste pit was legally commenced prior to 1978, the continued existence of such waste pit constitutes a new use for which coastal use permit was required; that the defendants never obtained the required state or local coastal use permit for the closure or post-CZM operations of their waste pits; that the defendants neither restored areas with pits to their original condition nor constructed the pits using the best practical techniques to prevent leaching; and that defendants have disposed of oil field wastes from their waste pits without permits. The plaintiffs also allege that "[s]ince 1978 and before, Defendants' oil and gas activities have resulted in the dredging of numerous canals[, which have] exceeded the limits of coastal use permits[;]" that the defendants' failure to adequately design or maintain these canals have caused erosion of marshes, degradation of terrestrial and aquatic life, and "has increased the risk of damage from storm-generated surges and other flooding damage, and has enabled and/or accelerated saltwater intrusion[;]" and that the defendants have failed to restore these canals to their original condition.

[4] This particular lawsuit concerns activities and operations by six defendants (Riverwood Production Company, Inc., Chevron U.S.A. Inc., Exxon Mobil Corporation, ConocoPhillips company, Estate of William G. Helis, and Graham Royalty, Ltd.) associated with the development of the Potash Oil & Gas Field in Plaquemines Parish,

damages, costs necessary to restore the coastal zone, actual
restoration, and reasonable costs and attorney's fees.

In their state court petitions, the plaintiffs attempt to
strategically "limit the scope of the claims and allegations of
this petition" to a state law cause of action under the SLCRMA and
accompanying state and local regulations.[5]  The plaintiffs
expressly disclaim advancing any federal claims whatsoever
(singling out their intention to disavow any right to relief under
federal law such as the Rivers and Harbors Act, the Clean Water
Act, any federal regulations, any claim under general maritime or
admiralty law).[6]

Notwithstanding these disclaimers, the defendants removed
these parish coastal zone cases to this Court and to the Western
District, initially alleging four bases for jurisdiction:
diversity jurisdiction; Outer Continental Shelf Lands Act; general
maritime law; or federal question jurisdiction.  The Court rejected

---

which the Parish contends have caused substantial damage to the
land and waterbodies in the Coastal Zone.

[5] To the extent that defendants' operations were not lawfully
commenced or established prior to the implementation of the CZM,
the plaintiffs nevertheless allege that "[t]he complained-of
operations and activities were prohibited prior to 1978 by various"
other provisions of Louisiana state law.

[6] The plaintiffs provide a comprehensive list of claims they submit
that they purposefully do _not_ advance in their state court
petition.  They single out several federal statutes and more
generically disclaim any attempt to recover for any defendant's
violation of a federal permit or any activity on the Outer
Continental Shelf.

all asserted bases of removal jurisdiction and remanded the cases
to state court.  See, e.g., Parish of Plaquemines v. Total
Petrochemical and Refining USA, Inc., 64 F.Supp.3d 872 (E.D. La
2014); Parish of Plaquemines v. Hilcorp Energy Co., 2015 WL 1954640
(E.D. La. 2015); Parish of St. Bernard v. Atlantic Richfield Co.,
2017 WL 2875723 (E.D. La. 2017).

Back in state court, the defendants filed motions requesting
that the plaintiffs identify the alleged state law violations
underlying the lawsuits.  The cases were progressing (some toward
early 2019 trial dates) when, on April 30, 2018, the plaintiffs
issued a Preliminary Expert Report on Violations in the related
Parish of Plaquemines v. Rozel Operating Co. case.[7]  Rather than
identifying clear-cut state permitting violations, the defendants
submit that the Expert Report revealed that the plaintiffs
"primarily attack activities undertaken before the state
permitting law at issue was effective and that were instead subject
to extensive and exclusive federal direction, control, and
regulation."  The plaintiffs' expert opined that three types of

---

[7] April 30 was the deadline for plaintiffs to provide preliminary
expert reports detailing the description of the specific SLCRMA
violations including specific instances of permit violations or
failures to obtain permits. The Expert Report was certified by the
Louisiana Department of Natural Resources and, thus, the
defendants contend, the Report is the DNR's its official position
for all cases.

activities occurred within the Bayou Gentilly case area that violated SLCRMA:

> First, there were certain uses that were legally commenced before 1980 but whose impacts changed post-1980, triggering the requirement for a permit that was never obtained. Second, there were certain uses that were illegally commenced at their beginning and therefore did not qualify for the exemption from coastal permitting or review. And third, there were certain uses that were commenced after 1980 that did not receive appropriate permits under SLCRMA.

Based on this Expert Report, the defendants, forum shopping for a second time, removed this and other similar lawsuits to this Court and to the Western District of Louisiana. This time, the defendants invoked federal subject matter jurisdiction based on 28 U.S.C. § 1331 (the federal question statute) and 28 U.S.C. § 1442 (the federal officer removal statute).[8] The plaintiffs moved to remand.

This Court again granted the motion to remand, holding that removal was untimely, that there was no federal-officer

---

[8] Shortly after round two notices of removal were filed, the Court stayed these proceedings on the defendants' motion pending a determination by the MDL Panel as to whether it would grant the defendants' motions to coordinate these cases. But on July 31, 2018, the United States Judicial Panel on Multidistrict Litigation denied the energy company defendants' motion for centralization of these lawsuits pending in the Eastern and Western District of Louisiana. See In re Louisiana Coastal Zone Land Loss Litig., MDL No. 2856, 317 F. Supp. 3d 1346 (2018). The Court promptly granted motions to reopen these cases.

jurisdiction because defendants neither acted under federal direction nor conducted activities with a causal nexus to the federal government's actions, and that no federal question jurisdiction could be found in this case.  See Parish of Plaquemines v. Riverwood Prod. Co., 2019 WL 2271118 (E.D. La. 2019).  Defendants appealed.

The Fifth Circuit affirmed in part, reversed in part, and remanded for further consideration.  See Parish of Plaquemines v. Chevron USA, Inc., 7 F.4th 362 (5 Cir. 2021).  The Fifth Circuit held that removal was indeed timely but affirmed this Court's holding that there is no federal question jurisdiction.  During the pendency of appeal, the Fifth Circuit overhauled its federal-officer jurisdictional test in an en banc decision known as Latiolais v. Huntington Ingalls, Inc., 951 F.3d 286, 290 (5 Cir. 2020) (en banc).  In light of the new standard, which eliminated the so-called "causal nexus" element of the test in favor of a broader and elusive "related to" element, the Fifth Circuit remanded purely for consideration of whether jurisdiction exists under the federal-officer jurisdictional test.  The Court considers.

## Legal Standard

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by'" the United States

7

Constitution and conferred by Congress.  Gunn v. Minton, 568 U.S. 251, 256 (2013) (citation omitted).  Whether or not this Court has authority to hear this case turns solely on the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which "is a pure jurisdictional statute in which the raising of a federal question in the officer's removal petition ... constitutes the federal law under which the action against the federal officer arises for [Article III] purposes."  Zeringue v. Crane Co., 846 F.3d 785, 789 (5 Cir. 2017) (quoting Mesa v. California, 489 U.S. 121, 136 (1989)).  The statute, as most recently amended in 2013, states (in relevant part):

> A civil action … that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending: … any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office.  28 U.S.C. § 1442(a), (a)(1).

Remand is proper if at any time the Court lacks subject matter jurisdiction.  28 U.S.C. § 1447(c).  Given the significant federalism concerns implicated by removal, the general removal statute is to be strictly construed "and any doubt about the propriety of removal must be resolved in favor of remand."  Gutierrez v. Flores, 543 F.3d 248, 251 (5 Cir. 2008) (citation omitted); Gasch v. Hartford Accident & Indem. Co., 491 F.3d 278, 281-82 (5 Cir. 2007) (citations omitted).  On the other hand,

unlike the general removal statute, the federal officer removal statute must be liberally construed.  See Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 147 (2007) ("The words 'acting under' are broad, and this Court has made clear that the statute must be 'liberally construed.'"); see also City of Walker v. Louisiana, 877 F.3d 563, 569 (5 Cir. 2017) ("federal officer removal under 28 U.S.C. § 1442 is unlike other removal doctrines: it is not narrow or limited").  Thus, although it remains defendants' burden to establish the existence of federal jurisdiction over this controversy, whether federal officer removal jurisdiction exists must be assessed "without a thumb on the remand side of the scale." Savoie v. Huntington Ingalls, Inc., 817 F.3d 457, 462 (5 Cir. 2016) (citations omitted).

## A. Federal Officer Removal Post-Latiolais

In Latiolais, the Fifth Circuit revised its jurisprudence on the federal-officer jurisdictional test in order to "align with sister circuits … [and] the plain language of the statute."  951 F.3d at 289.  Under the new test, removal requires a defendant show four predicates: "(1) it has asserted a colorable federal defense, (2) it is a "person" within the meaning of the statute, (3) that has acted pursuant to a federal officer's directions, and (4) the charged conduct is connected or associated with an act

pursuant to a federal officer's directions." <u>Latiolais</u>, 951 F.3d at 296. Each of those predicates has a distinct legal meaning.

## I.   "Colorable Federal Defense"

"Federal officer removal must be predicated on the allegation of a colorable federal defense." <u>Mesa v. California</u>, 489 U.S. 121, 129 (1989). In order to demonstrate a colorable federal defense, however, a defendant need not assert a "clearly sustainable" defense "as section 1442 does not require a federal official or person acting under him 'to win his case before he can have it removed.'" <u>Latiolais</u>, 951 F.3d at 296 (internal citations omitted). According to <u>Latiolais</u>, "an asserted federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" <u>Id.</u> at 297 (quoting <u>Zeringue v. Crane Co.</u>, 846 F.3d 785, 790) (5 Cir. 2017).

## II.   "Person"

There is no dispute that defendants are "persons" within the meaning of the statute.

## III.  "Acted Pursuant" or "Acted Under"

Latiolais says very little about this prong of the test, focusing instead on the first and fourth prongs.[9]  To the extent it addresses this element, it appears that Latiolais merely applies prevailing law to the facts.[10]   Defendants contest this characterization of Latiolais, arguing that "by eliminating the 'causal nexus' requirement and replacing it with the 'connection or association' test, Latiolais expanded the set of activities that satisfy both the 'acting under' and 'connection or association' requirements."  The Court disagrees.

The Fifth Circuit overruled its prior case law on this test due to a change in the language of the statute.  Where the statute previously made removable any case "against or directed to … any person acting under [a federal] officer … for any act under color of such office," the revised (and now operative) language made any such case removable by "any person acting under [a federal] officer

---

[9]  Notably, Latiolais does not presume to overrule prior jurisprudence on the first prong. It cites with favor as to the colorable federal defense prong several cases which it overrules as to their holdings on the fourth prong.  Compare Latiolais, 951 F.3d at 297 (citing Zeringue, 846 F.3d at 790 favorably with regard to whether or not a federal defense is colorable) with Latiolais, 951 F.3d at 296 n.9 (listing Zeringue as one of the cases overruled "to the extent that those cases erroneously relied on a 'causal nexus' test after Congress amended section 1442(a) to add 'relating to.'"  Id. at 296).  Critically, in Latiolais, the defendant benefitted from governmental contractor immunity.  Not so here.
[10]  See Latiolais, 951 F.3d at 296 ("Avondale performed the refurbishment and, allegedly, the installation of asbestos pursuant to directions of the U.S. Navy. Thus, this civil action relates to an act under color of federal office.").

… for or relating to any act under color of such office." See Latiolais, 951 F.3d at 292 (emphasis added). Because, as the Supreme Court has noted, "[t]he ordinary meaning of the[] words [relating to] is a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,'" Morales v. TWA, 504 U.S. 374, 383 (1992), the Fifth Circuit determined that its previous jurisprudence on the fourth prong of this test needed revision. Prior to Latiolais, the Fifth Circuit required a showing "that a causal nexus exists between the defendants' actions under color of federal office and the plaintiff's claims." Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 398 (5 Cir. 1998). Latiolais dispensed of the "causal nexus" test in favor of asking whether "the charged conduct is connected or associated with an act pursuant to a federal officer's directions." Latiolais, 951 F.3d at 296.

Latiolais only explicitly overrules cases "to the extent that those cases erroneously relied on a 'causal nexus' test after Congress amended section 1442(a) to add 'relating to.'" Id. The defendants would thus have the Court assume that the Fifth Circuit intended for that explicit overruling to also serve as an implicit overruling of this third prong. Moreover, Latiolais was prompted by a change in the language of the federal-officer removal statute. That change had no effect on the language which governs this prong,

namely, that removal may be effected by "any person acting under [a federal] officer." 28 U.S.C. § 1442(a)(1). The Court believes that if the Fifth Circuit had intended to expand the "acting under" test, it would have done so explicitly. Neither the plain language of Latiolais nor the plain language of the statute necessitates a change in the courts' jurisprudence on the "acting under" prong.

Alternatively, defendants may be suggesting that the third and fourth prongs of the test are so intertwined that a change in one necessitates a change in the other. However, the Fifth Circuit, in a post-Latiolais decision, has held otherwise: "though the 'acting under' and 'connection' elements may often ride in tandem toward the same result, they are distinct. In other words, a defendant might be 'acting under' a federal officer, while at the same time the specific conduct at issue may not be 'connected or associated with an act pursuant to the federal officer's directions.'" St. Charles Surgical Hosp., LLC v. La. Health Serv. & Indem. Co., 990 F.3d 447, 454 (5 Cir. 2021). The "acting under" analysis may therefore proceed in much the same way that it did prior to the Fifth Circuit's remand, albeit with the benefit of additional time, research, and factual evidence.[11]

---

[11] Defendants also suggest that, even if their predecessors were not "acting under" federal officers with regard to the challenged activity, their connection and association with entities that did act under federal direction satisfies this element of the test.

As such, to qualify as "acting under" a federal officer, private persons like these defendants must make "an effort to assist, or to help carry out, the duties or tasks of the federal superior[,]" and the federal officer must exert "subjection, guidance, or control" over the private company. Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 152 (2007). Merely being subject to federal regulation will not suffice to bring private action within the scope of the statute; rather, only private parties that are (often, contractually) obligated or "authorized to act with or for [federal officers or agents] in affirmatively executing duties under … federal law" are sufficiently "acting under" federal control. See id. at 151 (internal quotation and citation omitted). "When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court 'prejudice.'" Id. at 152. Simply complying with the law or regulations is insufficient to bring a private person within the scope of the officer removal statute's arising under requirement. Id. Courts must look for evidence of delegation perhaps contained in a contract, payment, employer/employee relationship, or principal /agent arrangement. Id. at 156. As the Fifth Circuit noted in a recent decision, "the 'acting under' inquiry examines the

---

The Court will address this argument later in this Order and Reasons.

*relationship* between the removing party and the relevant federal officer, requiring courts to determine whether the federal officer 'exert[s] a sufficient level of subjection, guidance, or control' over the private actor." St. Charles Surgical Hosp., 990 F.3d at 455 (citations omitted) (emphasis in original).

The paradigm "acting under" relationship is when a private person acts as directed by a federal law enforcement officer. See id. at 149 (describing pre-Prohibition Era liquor tariff cases upholding federal officer removals by federal revenue officers or those assisting federal revenue officers in their official duties in raiding distilleries and arresting distillers). Thus, "[w]here a private person acts as an assistant to a federal official in helping that official to enforce federal law," the private person may satisfy the acting under requirement. Id. at 151 ("private persons who lawfully assist the federal officer in the performance of his official duty" may permissibly invoke the statute).

IV. "Connected or Associated With"

As noted in the previous section, Latiolais effected a complete change in this prong from a "causal nexus" analysis to a "connection or association" test. Under the new test, and "[s]ubject to the other requirements of section 1442(a), any civil action that is connected or associated with an act under color of federal office may be removed." Latiolais, 951 F.3d at 296. This

test is, by intention, quite broad, and covers any and all acts that "'stand in some relation; … have bearing or concern; [or] pertain'" to acts under color of federal office. Id. at 292 (quoting Morales, 504 U.S. at 383).

Having reviewed the law which governs this case, the Court now applies the law to these facts.

**Analysis**

I.   Colorable Federal Defense

Defendants raise three key potential federal defenses: immunity, preemption, and due process.  Again, the Court need not conclude that these defenses will be successful at trial.  "[I]f a defense is plausible, it is colorable." Latiolais, 951 F.3d at 297.  The Court considers each in turn.

A. Immunity

Defendants' immunity defense rests on three possible theories.  Under the first, defendants have immunity under Boyle v. United Techs. Corp., 487 U.S. 500, (1988) as federal contractors.   The second theory suggests that defendants' predecessors were government subcontractors and may assert immunity through that relationship.   The third suggests that "irrespective of any contract, [defendants] acted under the government's direction and control under its war powers."  As will

be discussed further in latter sections, the Court cannot say defendants were federal contractors or subcontractors as relates to their challenged activities.  That leaves the third avenue for immunity.  Defendants rely on Ackerson v. Bean Dredging LLC, 589 F.3d 196 (5 Cir. 2009), in which immunity was granted to a federal contractor when "the actions causing the alleged harm were taken pursuant to contracts with the federal government that were for the purpose of furthering projects authorized by acts of Congress." Ackerson, 589 F.3d at 206.  The Court is not aware of any government contract with these defendants that required them to proceed with the challenged activities during WWII.[12]  The Court finds that these defendants cannot assert a viable claim for immunity on these facts.

   B. Preemption

   Defendants   claim   that   their   compliance   with   WWII authorizations  and  regulations  entitles  them  to  a  preemption defense.  At the heart of this case is whether or not defendants' actions in the oil fields of Southern Louisiana were "lawfully

---

[12] As will be discussed below, defendants submit that government contracts  with  related  parties  required  these  defendants  to proceed  with  the  challenged  activities  in  order  to  fulfill  the government contracts with those related parties, who needed crude oil  in  large  quantities.   At best, this is an indirect result of a  government  contract,  and  as  such  is  not  sufficiently  close  such that these defendants may take advantage of government contractor immunity.

established" such that no permit was required under the SLCRMA. Defendants claim that their actions were lawfully established – and even legally mandated – because of federal directions and/or regulations.  If they are correct, their compliance with federal regulations may be a viable defense against alleged violations of state law.  As defendants note, their argument is "not that WWII directives made it impossible for them to get a SLCRMA permit in 1980."  Instead, their argument is "that WWII directives made it impossible for defendants to conduct activities in the way that plaintiffs allege was required in the 1940s."  If shown to legally require otherwise illegal activities, those directives may well preempt state law.  Preemption is a viable defense.

C. Due Process

Defendants raise a federal due process defense, claiming that plaintiffs seek to impose "retroactive liability for conduct that was lawful when it occurred."  Plaintiffs respond that their claims are not based on retroactive application of the SLCRMA but instead are based on "coastal 'uses' occurring or continued on or after October 1, 1980."  While the Court agrees that plaintiffs are not retroactively applying the SLCRMA, the asserted violations of the SLCRMA relate to actions that were conducted during WWII.  The legality of those actions is at issue.  If the directives under which defendants claim they were required to act are held to not

have been sufficient for "lawful commencement" under the SLCRMA, defendants may have a viable due process claim.[13]

Because at least two of these three federal defenses are viable, the Court concludes that the first prong of this jurisdictional test is met.

## II.  "Person"

As previously noted, there is no dispute that the defendants are "persons" within the meaning of the statute.  The second prong of this jurisdictional test is met.

## III. "Acted Pursuant" or "Acted Under"

The third and crucial prong of the test is whether defendants "acted pursuant to a federal officer's directions."  <u>Latiolais</u>, 951 F.3d at 296.  Defendants advance three theories to satisfy this prong.  First, they assert that they were federal contractors. Second, they alternatively suggest that they were federal subcontractors.  Third, they submit that, even if no contract applies, the oil industry had a "special relationship" with the federal government such that defendants were under the direction of federal officers.  The Court will consider each in turn.

---

[13] Plaintiffs state that the defendants did not assert due process in their removal notice.  As plaintiffs do not assert that the initial omission renders this defense null and as the Court does not premise its decision on this defense alone, the Court merely notes that plaintiffs are correct.

A. Contractual Federal Direction

During WWII, Humble Oil operated Potash Field, which is the subject of this case.  The record shows no federal contract between Humble Oil and the federal government under which Humble Oil would have been directed to perform the actions which led to this lawsuit.  Instead, defendants advance a novel legal theory based on their interpretation of Latiolais under which the government contracts by which refineries produced aviation gas for government use suffice to give rise to jurisdiction for the upstream producer. As the Court is not convinced by defendants' interpretation of Latiolais, it declines to find that Humble Oil was a government contractor during WWII with regard to the relevant activities in this case.[14]  Such an interpretation would create nearly unlimited breadth under the federal-officer jurisdictional test whereby any supplier to a federal contractor could take advantage of that contract.

As summarized in a section heading, defendants' argument is that "Humble Oil's [challenged] activities in Potash Field [are] 'related to' government directives to refiners."  However, the government directives were directed at the refiners, and not at

---

[14] The Court notes for the sake of completeness and accuracy that Humble Oil appears to have had a federal contract to produce aviation gas at its own refinery.  Defendants do not rely on that contract here.

Humble Oil.  The removal statute permits removal by "any officer (or any person acting under that officer) of the United States or of any agency thereof … for or relating to any act under color of such office."  Defendants attempt to claim here that because federal officers directed the refineries to act, the related acts committed by Humble Oil in Potash Field (and now challenged in this lawsuit) grant Humble Oil's successor the right to remove.[15] However, Humble Oil did not act under "<u>that</u> officer," as required by statute.  The refineries, who had federal contracts and acted pursuant to those contracts, can likely remove "for or relating to" any related act, but that does not extend to those not under that contractual direction.

B. Sub-Contractual Federal Direction

Alternatively, defendants attempt to piggy-back on the federal contracts entered into by the refineries by claiming that Humble Oil was a government subcontractor whose product was necessary for fulfillment of the federal contract.  However, they can point to no document evidencing such a subcontract.  Defendants instead argue that their supplier relationships suffice to create subcontractor relationships.  To allow this argument would at best

---

[15] That Humble Oil and the relevant refinery have come to be owned by the same company and even their close relationship during WWII are unavailing.  Humble Oil as an entity as it was during WWII is the "person" at issue in this case for purposes of this statute.

confuse the meaning of the term "subcontractor."  Certainly, the product that Humble Oil supplied to the government contractors was necessary to the fulfillment of the contract.  There is no evidence, though, that Humble Oil took over any portion of the contract, as is generally required to be understood as a subcontractor.  See, e.g., Avondale Indus. v. International Marine Carriers, 15 F.3d 489, 494 (5 Cir. 1994) ("A subcontractor is one who takes a portion of a contract from the principal contractor or another subcontractor").  In any case, the Court is skeptical that a subcontractor relationship is sufficient to demonstrate that an entity is "acting under" a federal officer absent special circumstances demonstrating significant federal control over a particular subcontractor.[16]

---

[16] For example, defendants cite a Fourth Circuit case in which a subcontractor was permitted to exercise removal under this statute.  There, "[t]he DOD contract not only contemplated the use of subcontractors; it also made them directly accountable to the federal government." Cty. Bd. of Arlington Cty., Virginia v. Express Scripts Pharmacy, Inc., 996 F.3d 243, 253 (4 Cir. 2021).  Likewise, the case defendants cite from this district involved a subcontract in which the subcontractor "presented evidence at least plausibly demonstrating that the installation of asbestos-containing wallboard was required by the government contracts … and in turn the subcontracts." Jackson v. Avondale Indus. Inc., 469 F. Supp. 3d 689, 706 (E.D. La. 2020).  While defendants state that WWII-era regulations allowed the federal government to impose penalties for breach of a government subcontract and required suppliers to prioritize provision of materials to government contractors, neither of these general regulations demonstrates specific or direct control over Humble Oil's provision of oil to any refinery.

C. Non-Contractual Federal Direction

As defendants recognize, regulation is not the same as direction. Regulation is in many ways an exercise of legislative power; it applies broadly and generally without regard to particular entities. Direction is a form of judgment – it is more akin to an exercise of juridical power. To comply with federal regulations is required of every entity doing business in the United States.[17] To act pursuant to a federal officer's directions is to be told that you or your entity in particular must behave in a certain manner. Defendants paint a picture of an intensely regulated industry that was regulated even more strictly than usual during a critical period in this nation's history. Those regulations were designed to quite literally fuel the government's war effort, and certainly effected great changes in industry behavior, such as cooperation between competitors and massive increases in production. Some of those changes may even have otherwise been illegal. What defendants have not demonstrated is that they were doing any more than complying with regulation. In none of the many wartime orders entered into evidence is there a direct command by a federal officer that defendants must, for example, use leaking pits rather than steel tanks in the Potash

---

[17] Defendants' contention that they did not adhere to these mandates voluntarily is of no import; they were and are required to comply with all valid regulations under penalty of law.

oil field.[18]  Evidence that government regulations substantially limited the use of steel and even required permits to be issued for such uses of steel may play into a preemption defense or may indicate that the uses were "lawfully commenced," but they do not suffice to show that these defendants were "acting under [a federal] officer" when creating those pits any more than any other compliance with federal regulation.[19]

Defendants' response to this is that they had a "special relationship" with the federal government during WWII under which the government "commandeer[ed] … the oil industry so that it would timely provide huge quantities of critical petroleum products to the government itself for the prosecution of war" (emphasis removed).  They contrast this to the nature of the regulation cigarette companies faced in Watson v. Philip Morris.  There, the

---

[18] As this Court noted in its prior Order and Reasons, defendants do have evidence of one instance of federal oversight in the Potash Field involving an application for an exception to an order.  The exception, which was granted, was required to obtain materials to drill 10 wells directionally and on less stringent spacing requirements than otherwise required under prevailing regulations.  Defendants also point out that Potash Field was among the fields listed as "high value" by the government, and listed it, again among others, as a field needing to produce more oil than originally determined in order to meet war needs.

[19] At oral argument, defendants claimed that the wartime directives should not be considered "regulation" for purposes of this Act as they differed in type from ordinary regulation.  The Court is not convinced.  Although the regulation in this case may have been to the benefit of oil production, it remains that the regulations were generally applicable and for a defined purpose.  Their expiration at the close of war does not change their status any more than any regulation's expiry changes its status.

Supreme Court noted that the distinction between an intensely regulated entity and an entity which can avail itself of this statute is in "go[ing] beyond simple compliance with the law and help[ing] officers fulfill other basic governmental tasks." Watson, 551 U.S. at 153.  Under regulations and oversight conducted and enforced by the Petroleum Administration for War (PAW), these defendants claim that they were involved in "an effort to assist, or to help carry out, the duties or tasks of the federal superior." Id. at 152.  What defendants neglect in the holding of Watson is the emphasis the Supreme Court places on the importance of a contractual relationship.  They distinguish prior cases by noting that a prior defendant "fulfilled the terms of a contractual agreement" and state that in Watson there is no "evidence of any contract, any payment, any employer/employee relationship, or any principal/agent arrangement."  Id. at 153, 156.  Here, likewise, defendants have not shown any such direct relationship between the federal government and the entities whose actions are challenged.

    In the end, as the Supreme Court stated:

    The upshot is that a highly regulated firm cannot find a
    statutory basis for removal in the fact of federal regulation
    alone. A private firm's compliance (or noncompliance) with
    federal laws, rules, and regulations does not by itself fall
    within the scope of the statutory phrase "acting under" a
    federal "official." And that is so even if the regulation is
    highly detailed and even if the private firm's activities are
    highly supervised and monitored. Watson, 551 U.S. at 153.

So it is here.  The oil industry was indeed highly regulated, supervised, and monitored during WWII, and the regulation was both highly detailed and often quite specific.  In this case, the facts demonstrate compliance with regulation.  They do not demonstrate direction.  The PAW was given power to direct.  It threatened to direct.  But threats are not themselves direction.  Defendants have failed to show that they had a government contract, cannot demonstrate a sufficient subcontractor relationship under statute, and cannot show that they were otherwise "acting under" a federal officer.  Therefore they cannot avail themselves of removal under this statute.

   IV.  "Connected or Associated With"

   While the Court need not reach this prong of the test, it finds that for the sake of completeness it makes sense to do so. Assuming, *arguendo*, that defendants had shown that they were acting under the direction of a federal officer, the Court finds that their actions are "connected or associated" with that direction. The new "connection or association" test is a broad one, greatly expanding the scope of actions which qualify under this test.

   The challenged activities at issue in this jurisdictional dispute are, almost to a one, related to WWII efforts and/or regulatory directives.  For example, plaintiffs assert that oil companies extracted oil at overly high production rates, which

"generated accelerated wave action that erodes levees and destroys marshes."  Defendants respond that they maintained such high production rates to meet the government's need for aviation gas during WWII.  Plaintiffs also contend that oil companies should have used steel tanks at each well rather than earthen pits and central tanks, as the latter led to leakage and seepage. Defendants respond that the government's war effort and wartime regulations required minimal use of steel.  Under any of defendants' three broad theories by which they were "acting under" the direction of a federal officer during WWII, these actions are most certainly "related to" those directions.  The statutory language on this prong, as demonstrated aptly in Latiolais, is, possibly by design, very broad.

Plaintiffs respond that the challenged conduct is not the activities this Court has listed but is instead the defendants' failure to obtain permits when the SLCRMA came into effect in 1980. However, it is impossible to discuss the one without the other. The SLCRMA required permits for all "uses" in effect in 1980 that were not lawfully commenced.  Plaintiffs challenge certain activities as having violated the SLCRMA, which necessarily implies that plaintiffs contend that they were not lawfully commenced.  The commencement of the relevant activities is squarely raised by this lawsuit.  If the commencement was lawful, no permits were needed.  Even assuming that the charged conduct is defendants'

actions in 1980, defendants are correct that "to assess defendants'
1980 obligations, a factfinder *must* decide whether defendants'
activities were lawfully commenced."

★★★

This is not a decision on the merits of this case or on the
types of defenses available to the defendants.  It may well be
that the defendants' compliance with federal regulation entitles
them to a defense or demonstrates that their challenged activities
were "lawfully commenced" as required by the SLCRMA.  That is not
for this Court to judge.  The question before this Court is whether
defendants have satisfied the four-prong test enabling them to
remove this otherwise-state-law case into federal court.

The voluminous record in this case demonstrates that the oil
industry in WWII was intensely regulated.  It demonstrates that
the federal government had a great interest in the success of the
oil industry and a significant reliance thereupon.  However, while
defendants may have shown compliance with federal regulation, they
have failed to demonstrate that their compliance entitles them to
the removal provisions of this statute.  In order to remove,
defendants must show that they were "acting under" the direction
of a federal officer.  The Court finds that they were not.

Accordingly, for the foregoing reasons, IT IS ORDERED: that
the renewed motion to remand is GRANTED.

New Orleans, Louisiana, January 11, 2022

MARTIN L. C. FELDMAN

UNITED STATES DISTRICT JUDGE